155 F.3d 445
 Marilyn MINNS, individually and as parent and guardian of
Casey R. Minns (infant); Casey R. Minns; Kimberly Walsh,
individually and as parent and guardian of Jena Walsh
(infant); Jena Walsh; Denise Blake, individually and as
parent and guardian of Katelyn Blake (infant); Katelyn
Blake, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 97-2234.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 5, 1998.
Decided Sept. 2, 1998.
 
 ARGUED: Kenneth David Pack, Law Offices of Peter G. Angelos, P.C., Baltimore, Maryland, for Appellants. Henry Thomas Byron, III, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Appellee. ON BRIEF: H. Russell Smouse, Law Offices of Peter G. Angelos, P.C., Baltimore, Maryland, for Appellants. Frank W. Hunger, Assistant Attorney General, Lynne A. Battaglia, United States Attorney, Robert S. Greenspan, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Appellee.
 Before NIEMEYER and WILLIAMS, Circuit Judges, and HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WILLIAMS and Judge HOWARD joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 In preparation for Operation Desert Storm and the Persian Gulf War, the United States military inoculated its servicemen and exposed them to toxins and pesticides in anticipation of possible biological and chemical attacks by Iraq. The wives and children of three servicemen claim in this case that the military negligently administered and used "investigational" and defective drugs on the three servicemen, causing their children, who were born after the War, serious birth defects.
 
 
 2
 After the Judge Advocate General of the Air Force through delegated authority, see 32 C.F.R. § 842.42, disallowed their claims made under the Military Claims Act, 10 U.S.C. § 2731 et seq., the wives and children filed these three actions against the United States both to review the Judge Advocate General's decisions and to assert independent negligence claims under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. The district court ruled that it did not have jurisdiction to review the decisions of the Judge Advocate General and that exceptions to the Federal Tort Claims Act, as well as the doctrine stated in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), applied to exclude their claims under that Act.
 
 
 3
 Because the Constitution grants to Congress and not to the judiciary "plenary control over rights, duties, and responsibilities in the framework of the Military Establishment," Chappell v. Wallace, 462 U.S. 296, 301, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and Congress has not relinquished this control to the judiciary, we affirm the district court's order dismissing these cases. But our decision nonetheless invites Congress to review these claims in the context of ongoing scientific studies to assure that justice is accomplished for our returning veterans and their families.
 
 
 4
 * Sergeant Brad Minns of the U.S. Army, Chief Petty Officer Brian Walsh of the U.S. Navy, and Private Paul F. Blake of the U.S. Army are veterans of the Persian Gulf War which was fought in 1991. In preparation for the War, they were inoculated with drugs and exposed to pesticides by the military in anticipation of possible biological and chemical attacks by Iraq.
 
 
 5
 Following the war, each serviceman returned to his wife and fathered a child who was born with serious birth defects. All three children suffer from Goldenhar's Syndrome, a rare birth defect producing deformity, including asymmetry of the face and body, a partially developed or lopsided ear, internal fistulas, and, in some cases including these children, esophageal malformations and the absence of an anal opening. The families of these children recognize that scientific studies about the effects of the administered drugs and pesticides are in process and will not be concluded until later in 1998 or in 1999. Based on preliminary results from some studies, however, they believe that the toxins to which the servicemen were exposed were possibly stored in the servicemen's semen and passed on to their wives, where the toxins were stored in fatty tissue and ultimately were released during pregnancy to the fetus. The deformed children were born from one to two-and-one-half years after the servicemen were exposed to the toxins and pesticides.
 
 
 6
 The wives and children presented claims for damages to the Office of the Judge Advocate General under the Military Claims Act, 10 U.S.C. § 2731 et seq. After the Judge Advocate General disallowed their claims, they filed these actions to review the Judge Advocate General's decisions and to assert claims under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq.
 
 
 7
 In substantially similar complaints, the wives and children of these three returning servicemen allege that the United States "negligently administered [to the servicemen] a course of immunizations" and "negligently exposed [the servicemen] to a variety of unreasonably dangerous, toxic pesticides." The complaints state that the military "failed to supervise, direct and implement the use and exposure of their products," which were "hazardous, unreasonably dangerous, [and] defective." They further allege that the products were used "without proper testing, approval, warnings and directions." Each mother and child demands $20 million in damages as a result of the United States' negligence.
 
 
 8
 The United States filed a motion to dismiss these complaints under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, and the district court granted the motion, ruling that the Feres doctrine, as stated in Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and the "discretionary function" exception to the Federal Tort Claims Act barred plaintiffs' negligence claims under that Act and that the courts have no authority to review administrative decisions under the Military Claims Act. These appeals followed.
 
 II
 
 9
 Through enactment in 1948 of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., Congress waived the sovereign immunity of the United States for certain torts that otherwise could be proved against it. The FTCA did not create new causes of action but merely accepted liability against the United States for circumstances that otherwise "would bring private liability into existence." Feres, 340 U.S. at 141, 71 S.Ct. 153. Indeed, the FTCA expressly states that the United States is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.
 
 
 10
 Relying on this operation of the FTCA, the Supreme Court concluded in Feres that even after enactment of that Act, servicemen could not sue the government because "[w]e know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving." 340 U.S. at 141, 71 S.Ct. 153 (footnote omitted). The Court summarized, "[The Act's] effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities." Id. at 142, 71 S.Ct. 153. On this basis, the Feres doctrine, thus established, holds precisely that under preexisting law servicemen could not sue fellow servicemen or the government "for injuries to servicemen where the injuries arise out of or are in the course of activity incident to [military] service," id. at 146, 71 S.Ct. 153, and that the FTCA did not create or imply such liability.
 
 
 11
 The wives and children of the three servicemen involved in this case do not attempt to take issue with the conclusion that under the Feres doctrine the three servicemen do not have claims against the government for damages under the FTCA. But they argue that, as wives and children of servicemen, they are not barred from prosecuting a claim under the FTCA based on the United States' negligent acts directed at them. They observe that if they are not allowed to prosecute their tort claims under the FTCA, they have no remedy at all for their damages. To address their argument, we must first examine the scope of the Feres doctrine.
 
 
 12
 While justifications for the Feres doctrine include the fact that compensation is provided to servicemen through a no fault comprehensive benefit scheme and the fact that a serviceman's relationship to the government is a "distinctively federal" one, Stencel Aero Engineering Corp. v. U.S., 431 U.S. 666, 671, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), its principal justification focuses on the unique relationship between the government and its military personnel:
 
 
 13
 Although the Court in Feres based its decision on several grounds, in the last analysis, Feres seems best explained by the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty.
 
 
 14
 United States v. Shearer, 473 U.S. 52, 57, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) (internal quotation marks and citations omitted). The military has a unique need to operate under special regulations and rules of order to ensure "unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel." Chappell, 462 U.S. at 304, 103 S.Ct. 2362. This discipline "would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command." Id. Accordingly, consistent with the structure created by the Constitution, which leaves control of the military to the Legislative and Executive Branches, see U.S. Const. art. I, § 8; art. II, § 2, "Congress has created, and [the Supreme] Court has long recognized two systems of justice, to some extent parallel: one for civilians and one for military personnel." Chappell, 462 U.S. at 303-04, 103 S.Ct. 2362. "It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible--as the judicial branch is not--to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence." Id. at 302, 103 S.Ct. 2362 (quoting Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973)). Thus, even where a judicial action does not "contest the wisdom of broad military policy," the Feres doctrine requires courts to reject actions which are "the type of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." Shearer, 473 U.S. at 59, 105 S.Ct. 3039. If a suit requires deep inquiry into military decisions or would strongly impact military discipline, the Feres doctrine will bar it.
 
 
 15
 These considerations that prohibit servicemen's suits against the government also prompt the extension of the Feres doctrine to prohibit non-servicemen's suits against the government which are derivative of or ancillary to servicemen's injuries. See Kendrick v. United States, 877 F.2d 1201, 1206-07 (4th Cir.1989) (holding that Feres doctrine is "equally applicable" to family member claims "derivative" of a service member's injuries); Gaspard v. United States, 713 F.2d 1097, 1102 (5th Cir.1983) ("Courts ... have widely ruled that FTCA relief is not available to family members for claims based on the injuries to their relatives in the armed forces.... This is true even when the claims of the family members are independent of the serviceman's cause of action" (citing cases)). The reason for this extension is clear. Because such non-servicemen's suits would require courts to engage in exactly the same intrusion into military decisions as would servicemen's suits, such as by requiring military personnel to testify against their commanding officers, they would pose almost as many problems--judicially and militarily--as would a serviceman's suit over the same issue. See id. at 1102.
 
 
 16
 For this reason, most courts have adopted a "genesis" test for evaluating whether the Feres doctrine applies to derivative genetic injury claims of servicemen's children based on governmental negligence in exposing the servicemen to dangerous substances. See, e.g., Hinkie v. United States, 715 F.2d 96, 98-99 (3d Cir.1983); Lombard v. United States, 690 F.2d 215, 223-24 (D.C.Cir.1982); Monaco v. United States, 661 F.2d 129, 133 (9th Cir.1981). Under this test, if a non-serviceman's injury finds its "genesis" in the injury suffered by a serviceman incident to service, then the Feres doctrine bars the non-serviceman's suit. See, e.g., Hinkie, 715 F.2d at 98-99. Stated otherwise, if the non-serviceman's suit is based on essentially the same facts as the potential serviceman's suit or the non-serviceman's suit could not have happened "but for" the serviceman's cause of action, then under the genesis principle the Feres doctrine precludes the suit. See, e.g., Gaspard, 713 F.2d at 1102; Lombard, 690 F.2d at 223-24.
 
 
 17
 Until now, we have not had occasion to address the merits of this test. In Romero v. United States, 954 F.2d 223 (4th Cir.1992), we did permit a suit to proceed against the United States based on an infant's injury caused by a military doctor's failure to undertake specified prenatal procedures. We observed, however, that because the purpose of the failed treatment "was to insure the health of a civilian," id. at 225 (emphasis added), and the government owed an affirmative duty of care "directly" to the civilian, id. at 226, the genesis test did not apply. We recognized, however, that the test might nevertheless bar a derivative injury claim where a "civilian injury ... derives from a service-related injury to a service person," such as occurs when service members are exposed to radiation or Agent Orange resulting in later injury to a fetus or infant. Id. (emphasis added).
 
 
 18
 Because the genesis test well accords with the primary purpose of the Feres doctrine and is applicable to factual circumstances similar to those presented in this case, we now join the other circuits which have adopted it as their test for evaluating tort claims of non-military personnel that derive from servicemen's relationships with the government.
 
 
 19
 Turning to the circumstances before us, the military decided to inoculate its servicemen, including the three servicemen involved in this case, and to expose them to drugs and pesticides in anticipation of possible biological and chemical attacks by Iraq. Even if the military had been negligent in carrying out this program, the families of the servicemen agree that the Feres doctrine prevents the servicemen themselves from suing the United States under the FTCA. They maintain, however, that because they are wives and children of servicemen, not servicemen themselves, their claims are not barred by Feres. But they overlook the fact that, in advancing their own negligence suits, they rely upon the same negligent acts that allegedly impacted the servicemen.
 
 
 20
 Under the chain of causation that these wives and children assert, the military's negligence in implementing and administering the inoculation program to the servicemen resulted in making them carriers of the toxins to their wives and ultimately to their newborn children. This negligence in implementing and administrating the program to the servicemen thus was the "genesis" and the "but for" cause of the injuries to the wives and children. To establish the liability of the United States, the wives and children would have to challenge the decisions and acts of military personnel in preparing for war, and their suits would thus entail second-guessing decisions and acts that were indisputably "incident to military service." If allowed to proceed, their suits would place the courts in exactly the position that the Feres doctrine was designed to avoid.
 
 
 21
 The wives and children have attempted to bypass this straightforward application of the Feres doctrine in several ways. First, they point out that they have not alleged that the servicemen were injured, arguing that the only injury alleged occurred to themselves. But the omission of this allegation is not critical to the Feres analysis. "[T]he focus of Feres is not upon when the injury occurs or when the claim becomes actionable, rather it is concerned with when and under what circumstances the negligent act occurs." Kendrick, 877 F.2d at 1203 (emphasis added). "Whether [the plaintiffs'] injury 'occurred' when [they were] born with a birth defect or when[their] father[s] suffered chromosomal change, the allegedly negligent act drawn into question was performed while [the servicemen were] in the service." Monaco, 661 F.2d at 133. Thus, the inquiry must focus on whether the negligent act is the basis for the "type of claim[ ] that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." Shearer, 473 U.S. at 59, 105 S.Ct. 3039. We conclude that the plaintiffs cannot escape the fact that the negligent acts alleged in their complaint find their basis in the military's decision to inoculate its soldiers with drugs and to expose them to pesticides, and the issue of whether they can allege or demonstrate injury is irrelevant to the analysis. See, e.g., Monaco, 661 F.2d at 134 (holding that the fact that a plaintiff may seek relief from injury not based on the injury of the serviceman "does not change the substantive analysis [because] the court must still examine the Government's activity in relation to military personnel on active duty").
 
 
 22
 The plaintiffs also argue that the operative relationship is the contact they had with the dangerous products and that because they were not in the service, their injuries were not incident to military service. But this allegation still does not alter the outcome derived from applying the genesis test. The plaintiffs' exposure to the chemicals occurred because the servicemen first and necessarily were exposed. Because the servicemen's exposure to the chemicals is the genesis of the plaintiffs' alleged contact with the chemicals, Feres bars the claims.
 
 
 23
 The plaintiffs make a separate argument that the government's failure to warn was an independent act of negligence which was not derivative of servicemen's claims but which directly affected the plaintiffs. Similarly, however, this allegation arises out of the general failure to warn about the risks associated with a military decision made to protect soldiers during an impending war. Questioning the military's decision not to warn either the soldiers or their families about the possible risks of inoculation or exposure to pesticides would again create the court-intrusion problem that the Feres doctrine aims to avoid. Courts would be questioning strategies, defense preparations, and the military's control of information, contrary to their authority. See, e.g., Persons v. United States, 925 F.2d 292, 296-97 (9th Cir.1991); Heilman v. United States, 731 F.2d 1104, 1107-09 (3d Cir.1984).
 
 
 24
 Finally, the plaintiffs argue that some of the underlying rationales for the Feres doctrine do not apply to them. They note, for example, that as wives and children they do not have a distinctively federal relationship to the government nor do they have an effective remedy for their claims under present law, and thus that two justifications for the Feres doctrine are not relevant in their case. Even so, the plaintiffs cannot avoid the fatal consequence that their suits would require the judiciary to enmesh itself deeply into military decisions, a consequence that implicates the primary justification for the Feres doctrine.
 
 
 25
 Because the wives' and children's claims against the United States are derivative of the military's alleged negligent acts directed at its servicemen, the Feres doctrine, applied through the genesis test, bars them.
 
 III
 
 26
 Even were the Feres doctrine not determinative of the United States' liability to the wives and children in this case, the wives and children would still have to demonstrate that they did not fall within any of the several exceptions to recovery under the Federal Tort Claims Act. The first of these exceptions states that sovereign immunity is not waived for "[a]ny claim based upon an act or omission of an employee of the Government ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (emphasis added). Plaintiffs argue that the discretionary function exception does not apply because they are alleging the negligent administration of a decision and a negligent failure to warn. They are adamant in pointing out that they are not alleging negligent policy choices.
 
 
 27
 Although Congress did not expressly define what it meant by the term "discretionary function," the Supreme Court has explained that with the discretionary function exception, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. Varig Airlines, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Thus, when governmental conduct (1) is the product of choice or is a judgment and (2) is "based on considerations of public policy," it becomes a discretionary act shielded from tort liability. See Berkovitz v. United States, 486 U.S. 531, 536-37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); Williams v. United States, 50 F.3d 299, 309 (4th Cir.1995); see also United States v. Gaubert, 499 U.S. 315, 324-25, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). On the other hand, if governmental conduct is prescribed by federal statute, regulation, or policy, the discretionary function exception does not apply because "the employee has no rightful option but to adhere to the directive." Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954.
 
 
 28
 We should note that when discretionary decisions are ones of professional military discretion, they are due the courts' highest deference. See Tiffany v. United States, 931 F.2d 271, 277 (4th Cir.1991) ("Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense"). And the "complex, subtle, and professional decisions" of how to protect American soldiers in time of war and how to administer such protection are decisions that are "essentially professional military judgments," overseen by the Legislative and Executive Branches. Id. at 278 (quoting Gilligan, 413 U.S. at 10, 93 S.Ct. 2440).
 
 
 29
 In applying these principles to the facts of the complaint, we must address three discrete aspects of the plaintiffs' negligence allegations. First, the plaintiffs allege that the United States was negligent in administering the inoculations and pesticides, principally by using "investigational" drugs, long-stored drugs, defective drugs, or hazardous combinations of drugs. They are careful to note that they are not challenging the underlying policy decision to use the drugs, maintaining that the "operational" decisions of administering drugs are not protected in the same way that "planning" decisions are. Second, the plaintiffs allege that the United States was negligent in providing inadequate warning about the drugs. And finally, they allege that the military lacked governmental authority to make its exposure decisions.
 
 
 30
 On the first aspect of the negligence alleged, we conclude that the plaintiffs' attempts to distinguish, through semantic refinement, between decisionmaking and administrative conduct, as well as between "operational" and "planning" decisions, do not withstand scrutiny in the circumstances of this case. Even if the military used investigational, worn out, or defective drugs that had been stored too long, someone in the military nevertheless made the decision to use them, and that decision, with all its alleged flaws, amounted to a judgment that the risk of using these drugs was less than the risk of exposing unprotected soldiers to potential biological and chemical attack. Not only did that decision lead to the use of drugs and pesticides but it also included the decision to use the particular drugs available and in the combinations that were thought necessary to accomplish the intended objective. However this aspect of the negligence claim is characterized, it aims directly at the military's decisions to use these particular drugs in the context of given knowledge and risks. Nothing could be closer to the core of discretion as defined in Berkovitz and Varig.
 
 
 31
 The plaintiffs' efforts to distinguish between "operational" decisions and "planning" decisions are also not useful to them because the Supreme Court has rejected making a distinction on this basis. In Gaubert, the Court explained that "[a] discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policy-making or planning functions." Gaubert, 499 U.S. at 325, 111 S.Ct. 1267. Rather, decisions that take place in the administration of a policy decision are also protected--even if an abuse of discretion--so long as they are judgments based on policy considerations. Id. at 326, 111 S.Ct. 1267.
 
 
 32
 On the second aspect of the plaintiffs' negligence claims, involving a failure to warn, the decision whether to warn soldiers and their families of the potential effects of inoculations and pesticides also amounted to a judgment call. The decision whether to warn about the effects of inoculations and pesticides implicates other military decisions such as whether to risk alerting the enemy about war preparations and whether to give a warning that might be harmful to cohesion, particularly when the decision had already been made to use the drugs. This decision falls equally at the core of the discretionary function exception. As the Seventh Circuit has noted, the decision to warn is "replete with choices" and requires "ascertaining the need for a warning and its cost," "determining the group to be alerted, as well as the content and procedure of such notice," and ultimately, "balanc[ing] safety with economic concerns." Maas v. United States, 94 F.3d 291, 297 (7th Cir.1996); see also Williams, 50 F.3d at 310; In re Agent Orange, 818 F.2d 194, 200-01 (2d Cir.1987) (holding that a failure to warn is a discretionary function and that "[t]he very paucity of proof concerning the possible deleterious effects of Agent Orange made the decision whether to issue a nationwide health warning even more clearly an exercise of discretion"). But see Dube v. Pittsburgh Corning, 870 F.2d 790, 798-800 (1st Cir.1989) (holding that a failure to warn was not a policy judgment).
 
 
 33
 Finally, on the third aspect, which alleged a lack of authority to administer the inoculation program, the plaintiffs have pointed to no statute or regulation that limits the military's authority to make these policy decisions. Without such a limitation, the military's decisions are necessarily discretionary.
 
 
 34
 Because we find that the discretionary function exception in the Federal Tort Claims Act bars the plaintiffs' suits, we need not consider the other exceptions of the Federal Tort Claims Act raised by the United States, namely, that the decisions involved "combatant activities" and that the negligence occurred in a "foreign country." See 28 U.S.C. § 2680(j), (k).
 
 IV
 
 35
 Finally, the plaintiffs seek judicial review of the Judge Advocate General's decision disallowing their claims under the Military Claims Act, 10 U.S.C. § 2731 et seq. They urge that we remand these cases to the Office of the Judge Advocate General to await completion of the pending studies on the effects of the Gulf War inoculations and pesticides. Unfortunately for the plaintiffs, however, the Military Claims Act does not provide for judicial review of the Judge Advocate General's decisions. Rather, it provides, "Notwithstanding any other provision of law, the settlement of a claim under section 2733 ... is final and conclusive." 10 U.S.C. § 2735 (emphasis added). The Act defines "settle" to mean "consider, ascertain, adjust, determine, and dispose of a claim, whether by full or partial allowance or by disallowance." 10 U.S.C. § 2731.
 
 
 36
 We believe that when Congress provided that the decisions of the Judge Advocate General are "final and conclusive," it placed final discretion over military claims with the military and not with the courts. All of the circuits which have interpreted these provisions agree, concluding that the "final and conclusive" language of § 2735 bars judicial review in all but cases of constitutional error. See Collins v. United States, 67 F.3d 284, 286-88 (Fed.Cir.1995); Schneider v. United States, 27 F.3d 1327, 1331-32 (8th Cir.1994); Hata v. United States, 23 F.3d 230, 232-33 (9th Cir.1994); Rodrigue v. United States, 968 F.2d 1430, 1432-34 (1st Cir.1992); Poindexter v. United States, 777 F.2d 231, 233-37 (5th Cir.1985); Broadnax v. United States Army, 710 F.2d 865, 867 (D.C.Cir.1983) (barring judicial review except in limited circumstances); Labash v. United States Dep't of Army, 668 F.2d 1153, 1155-56 (10th Cir.1982). Because the plaintiffs assert no question of constitutional magnitude, we must affirm the court's dismissal of the plaintiffs' claims under the Military Claims Act.
 
 V
 
 37
 Our rulings in these cases leave the wives and children of the three returning servicemen without a judicial remedy, even if their claims have merit. As the plaintiffs readily acknowledge, scientific studies have not yet demonstrated the necessary causal link between the servicemen's inoculations and pesticide exposure and their children's birth defects. If scientists are able to demonstrate that this link exists, the matter might become an appropriate one for the serious consideration of Congress. Congress has a long history of providing warranted relief for the impact of military service on veterans and their families, and to remedy the service-related injuries of our veterans and their families is a proper and noble function of the Legislative Branch. See Chappell, 462 U.S. at 302, 103 S.Ct. 2362.
 
 
 38
 AFFIRMED.