Rehearing en banc granted, August 31, 2005

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RAWLS R. HAWES,

*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

No. 04-1736

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-03-869-1)

Argued: February 1, 2005

Decided: May 26, 2005

Before WIDENER, MOTZ, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the majority opinion, in which Judge Widener joined. Judge Motz wrote a dissenting opinion.

## COUNSEL

**ARGUED:** H. Jan Roltsch-Anoll, SZABO, ZELNICK & ERICKSON, P.C., Woodbridge, Virginia, for Appellant. Leslie Bonner McClendon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee.

**OPINION**

GREGORY, Circuit Judge:

Before this court, Rawls R. Hawes appeals the dismissal of his tort action, pursuant to Fed. R. Civ. P. 12(b)(1), against the United States of America. Specifically, the district court held that the discretionary function exception to the Federal Torts Claims Act covered all of the allegedly negligent actions undertaken by the United States. Given that the claims were not actionable, the district court found that it had no subject matter jurisdiction and dismissed the case.

Finding no error on the part of the district court, we affirm.

I.

Rawls R. Hawes ("Hawes") accompanied his younger brother and father, a retired member of the United States Coast Guard, to the Quantico Marine Corps Base ("Base") located in Quantico, Virginia. The Base is home to multiple man-made obstacle courses. The NATO obstacle course, located in the Camp Barrett section of the Base, consists of approximately twenty man-made obstacles in an open field. According to Major Darin Clarke, "*[i]t was put together to have obstacles that you may want — you may need to negotiate during combat.* It is a variety of climbing, jumping, skills. . . ." J.A. 774 (emphasis added). The Scale of Integrity is one of these obstacles. It consists of a twenty-two foot long, four-inch thick wooden beam held seven feet in the air by four iron posts. Just prior to Hawes's visit, Major Clarke had ordered maintenance on the Scale of Integrity. According to Major Clarke, "[t]he board that was on there started to splinter and so I wanted to get a new board up there to reduce the splinters when that course is being negotiated." J.A. 776. Major Clarke made a request to the Base's Range Management Detachment, who in turn assigned Staff Sergeant John Raventos ("SSgt. Raventos") to perform the requested repairs. SSgt. Raventos received the work order and shortly thereafter visited the course with Major Clarke to determine exactly what repairs needed to be made. SSgt. Raventos ordered a new wooden beam for the Scale of Integrity, which was delivered to the Base on January 8, 2001.

On January 12, 2001, the Friday before the Martin Luther King Jr. holiday, SSgt. Raventos took a crew to the obstacle course with the intention of installing the new wooden beam. After pulling the old beam down and placing the new beam on the iron poles, the forklift used to place the beam on these poles was needed elsewhere on the Base and was taken from the NATO obstacle course. Then, while attempting to drill the holes to secure the new beam in place, the portable drill the crew was using ran out of power. The marines left the beam unfastened on top of the poles, and went to determine if another power generator was available. Upon determining that there was not, the marines were dismissed because it was a holiday weekend and their holiday started at noon. SSgt. Raventos then returned to the course to place four safety cones at the obstacle.[1] SSgt. Raventos planned to return on Tuesday, January 16, 2001 with proper equipment to secure the beam.

However, on Sunday, January 14, 2001, Hawes attempted to navigate the Scale of Integrity. As Hawes attempted to pull himself up onto the unbolted beam, it shifted causing Hawes to fall to the ground. The beam then fell off the iron poles and onto Hawes's leg, crushing his femur and causing permanent damage.

Hawes subsequently brought this action, alleging both negligence and gross negligence on the part of the Government during the maintenance of the Scale of Integrity. The Government moved for dismissal under Fed. R. Civ. P. 12(b)(1), or in the alternative Fed. R. Civ. P. 56. The district court granted the Government's 12(b)(1) motion, finding that the challenged actions were covered by the discretionary function exception to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2680(a) (2005), which divested the court of subject matter jurisdiction. Applying the test enunciated by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315 (1991), and *Berkovitz v. United States*, 486 U.S. 531 (1988), for identifying discretionary government functions protected from the reach of the FTCA, the district court first found that the decision was discretionary because no federal standard governed the Government's maintenance of the obstacle. The district court next found that the decision to stop

---

[1]According to SSgt. Raventos, he placed two cones on top of the beam and two cones at the foot of the beam. J.A. 897.

the maintenance, leaving the unbolted beam on the posts, even if there was no adequate warning, was tied to the exercise of judgment based upon considerations of public policy. Because the court found that the military was balancing technical, military, and social considerations, it found that the second prong of the discretionary function exception test was satisfied.

From that decision, Hawes brings this appeal.

## II.

The dismissal of an action under Rule 12(b)(1) is a matter of law reviewed *de novo*. *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996). As a general matter, "the plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1), because [t]he party who sues the United States bears the burden of pointing to . . . an unequivocal waiver of immunity." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (internal citations omitted).

Multiple district courts in this Circuit have read this ruling as placing the burden of persuasion to defeat the assertion of an exception to the FTCA waiver on the plaintiff. *See Hostetler v. United States*, 97 F. Supp. 2d 691, 695 (E.D. Va. 2000); *Jackson v. United States*, 77 F. Supp. 2d 709, 712 (D. Md. 1999). We agree, and note that this approach is in line with that enunciated by the First Circuit. *See Hydrogen Technology Corp. v. United States*, 831 F.2d 1155, 1162 n.6 (1st Cir. 1987) (noting "when an exception to the FTCA applies, sovereign immunity is still intact and federal courts have no subject matter jurisdiction to entertain an action.").[2]

---

[2]In *Zielinski v. United States*, No. 95-2160, 1996 WL 329492, at *3 (4th Cir. June 6, 1996), this court endorsed the Ninth Circuit's view that the plaintiff bears the initial burden of persuading the court that it has jurisdiction under the FTCA's general waiver of immunity. After this burden is satisfied, the burden falls on the government to prove the applicability of an exception to the FTCA. *Prescott v. United States*, 973 F.2d 696, 701 (9th Cir. 1992). However, because unpublished opinions have no precedential value in this circuit, *see* Local Rule 36(c), we rely on *Williams*.

### III.

The FTCA constitutes a waiver of the sovereign immunity of the United States, allowing the government to be liable in tort "in the same manner and to the same extent as a private individual under like circumstances, but [the government] shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. However, the FTCA is subject to a number of exceptions, the discretionary function exception being one. *Baum v. United States*, 986 F.2d 716, 719 (4th Cir. 1993). The discretionary function exception excludes from the FTCA's waiver:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (2005). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).

As this court has recognized, "[t]hough the purpose underlying the discretionary function exception is well accepted, courts have encountered some difficulty in applying its rather general terms to the myriad of fact patterns that predictably present themselves. . . ." *Baum*, 986 F.2d at 719-20. However, two recent Supreme Court decisions, *United States v. Gaubert*, 499 U.S. 315 (1991) and *Berkovitz v. United States*, 486 U.S. 531 (1988), laid out a two-part test that somewhat clarified the application of this important statute. First, a court must determine whether the governmental conduct challenged involves an element of judgment or choice. *Baum*, 986 F.2d at 720 (citing *Gaubert*, 499 U.S. at 322-23; *Berkovitz*, 486 U.S. at 536). The essential inquiry here is whether the challenged conduct "is the sub-

ject of any mandatory federal statute, regulation, or policy prescribing a specific course of action." *Baum*, 986 F.2d at 720. Where there is such a statute, regulation, or policy, there is no discretion, and therefore no exception, "because 'the employee has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536).

However, upon finding an element of discretion, the court must then determine whether the judgment is "of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23. As the Supreme Court stated in *Gaubert*:

> Because the purpose of the exception is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'"

*Id.* at 323 (citations omitted). As enunciated by *Gaubert*, this second element of the test grants broad latitude to the government. First, *Gaubert* enunciated a presumption that "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324. Next, the policy analysis looks not toward the actual considerations of a government agent in undertaking the conduct in question, but instead to whether the actions "*are susceptible to policy analysis.*" *Id.* at 325 (emphasis added). Finally, "it is the nature of the conduct, rather that the status of the actor that governs whether the exception applies." *Id.* In so stating, the Court was clearly rejecting the notion that the exception did not reach decisions made at the operational or management level. *See id.* As this circuit has read *Gaubert*, "a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect to be grounded in considerations of policy." *Baum*, 986 F.2d at 720-21.

Upon satisfaction of these two elements, the FTCA's waiver of sovereign immunity is no longer applicable.

## A.

First, we must determine whether the challenged conduct involved an element of judgment or choice. The essential inquiry here is whether the challenged conduct "is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action." *Id.* at 720. "If no such mandatory statute, regulation, or policy applies to remove the challenged conduct from the choice and judgment of the government, then we move to the second tier of the *Berkovitz-Gaubert* analysis." *Id.*

Before this Court, Hawes makes only a token effort at identifying a statute, regulation, or policy that prescribes a specific course of action that SSgt. Raventos should have followed. In full, Hawes argues that SSgt. "Raventos was subject to the MCB Safety Program that expressly required him to be responsible for 'using normal caution, common sense, and foresight' in his work and to warn others of known hazards." Appellant's Brief 14. However, this effort is herculean compared to that put forth before the district court. There, the district court found that Hawes admitted "that no federal standard directly governs the maintenance and repair of the obstacle course." *Hawes v. United States*, 322 F. Supp. 2d 638, 641 (E.D. Va. 2004). Hawes, in his "Memorandum in Opposition to Defendant's Motion to Dismiss or For Summary Judgment", did "not dispute that the Marine Corps did not have a specific regulation requiring the posting of signs for the general public warning of repairs or maintenance on the obstacle." J.A. 913. Further, Hawes argued the internal rules and regulations of the Base, of which the MCB safety program would be one, "are irrelevant to the determination of this case." J.A. 913. Thus, we find that the argument that the MCB Safety Program constitutes a statute, regulation, or policy that prescribes a specific course of action that SSgt. Raventos should have followed was not raised before the district court, and therefore refuse to address it here. *See e.g. Skippy, Inc. v. CPC International, Inc.*, 674 F.2d 209, 215 (4th Cir. 1982)("In the absence of exceptional circumstances, questions not raised and properly preserved in the trial forum will not be noticed on appeal.").

As such, we limit our review of this matter to the specific issue considered by the district court: whether considerations of public policy were the basis for decisions regarding repairs to the obstacle?

B.

Here, we must determine whether the challenged decisions are of the kind that the discretionary function exception was designed to shield. In other words, were these decisions based on public policy? In essence, Hawes argues that the proper focus of the inquiry is not on the Government's decision to repair the Scale of Integrity, but solely on the decisions made by SSgt. Raventos while repairing the obstacle itself. Hawes concedes that the decision to replace the beam on the Scale of Integrity involved policy considerations. For Hawes, however, any considerations of public policy ended with that decision.

"Public policy," as used in this specific context, is defined as involving considerations of economic, social, or political policy. *See Gaubert*, 499 U.S. at 323. This court has interpreted *Gaubert* to require that we look to the nature of the challenged decision in an objective or general sense. *See Baum*, 986 F.2d at 720-21. However, this does not mean that we ignore the actual conduct challenged. The *Gaubert* Court listed and examined the specific allegations made by the plaintiffs in that case. *See Gaubert*, 499 U.S. at 327-28. There, examining charges that federal regulators assumed day-to-day decision making authority and negligently discharged their duties, the Court examined challenged conduct such as government regulators mediating salary disputes. *Id.* at 328. "The question in this case is whether the governmental activities *challenged by petitioners* are of this discretionary nature." *Berkovitz*, 486 U.S. at 539 (emphasis added). Therefore, while we focus on SSgt. Raventos's decisions to cease the repair of the Scale of Integrity until after the weekend holiday and the alleged failure to warn adequately, we view these decisions in an objective or general sense, keeping in mind the context within which they were made. Viewing the decisions in question through that lens, we then seek to determine whether the decisions in question were based on considerations of public policy.

In this circuit, we have interpreted the phrase "public policy" broadly to include a wide variety of government judgments. In *Baum*, we held that the National Park Service's judgments regarding the maintenance of its bridges and guardrails were covered by the discretionary function exception because they pertained to the allocation of

government resources, a consideration "inherently bound up in considerations of economic and political policy." *Baum*, 986 F.2d at 724. Similarly in *Bowman v. United States*, 820 F.2d 1393, 1395 (4th Cir. 1987), we held that the failure of the National Park Service to erect a guardrail was a policy determination. There, we stated that:

> [w]hether the decision grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three is not known. What is obvious is that the decision was the result of a policy judgment.

*Id.* Further, in *Smith v. WMATA*, 290 F.3d 201, 205, 212 (4th Cir. 2002), we applied FTCA principles to a case in which the plaintiffs challenged WMATA's alleged failure to repair and maintain its escalators and "conclude[d] that the [WMATA] is entitled to be accorded immunity under the discretionary function exception for its decisions at the Bethesda station . . . (1) to brake escalator one and utilize it as a stationary walker; (2) to leave escalator three disassembled; and (3) to provide no specific warning to its patrons of the situation at the station." There, we found that the repair/maintenance decisions regarding the escalators "implicated the ecopolicy of the METRO, i.e., whether it was more cost-effective to reassemble Escalator Three pending repair, or whether to wait until replacement parts arrived." *Id.* at 210.[3]

In the face of this broad, unflinching history, Hawes charges that the challenged decisions do not constitute the types of decisions intended to be covered by the discretionary function exception because they are not susceptible to a policy analysis. Hawes relies heavily on our language in *Baum*, where we stated that "we do not suggest that every maintenance decision of every government actor is so policy-based as to fall within the discretionary function exception,"

---

[3]See also *Patton Electric Co. v. United States*, 64 F. Supp. 2d 580, 583 (E.D. Va. 1999) ("Deciding when a product safety alert should be issued, how the alert should be communicated to federal customers, and how to identify, gather, and repair the defective products are essentially cost-benefit economic and political decisions.").

*Baum*, 986 F.2d at 724, and argues that SSgt. Raventos's decisions to leave the plank unbolted and not provide an adequate warning are exactly the types of decisions the above language contemplates.[4]

However, it is well established in this circuit that "when discretionary decisions are ones of professional military discretion, they are due the courts' highest deference." *Minns*, 155 F.3d at 451 (citing *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991)). Given that level of deference, in combination with this circuit's broad discretionary function exception jurisprudence, we believe it is plain that SSgt. Raventos's actions are covered by the exception. SSgt. Raventos, a Marine, was charged with repairing military equipment used to train marines for combat on a military base. In order to complete this task SSgt. Raventos had military resources, including four marines, at his disposal. Because the repair of military equipment on a military base

---

[4]In *Gaubert*, the Court stated:

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Gaubert*, 499 U.S. at 325. The dissent analogizes the conduct in question here to the above example, and argues that the conduct in question here was not grounded in regulatory policy.

However, the conduct in this case, unlike that in the *Gaubert* example, was not tangential, but instead directly related to the completion of the task at hand. It is undisputed that the military possessed the discretion to maintain military equipment. While maintaining the Scale of Integrity, SSgt. Raventos exercised this discretion with an eye toward military and economic policy. The challenged decisions were integral to the completion of the task for which the discretion in question existed. Because of this, we are not persuaded that the cited *Gaubert* example is on point here.

involves the allocation and management of scarce military resources, we find that the underlying decisions implicate economic policy.

Critically, SSgt. Raventos was also acting with an eye toward military policy when he made the discretionary decisions to leave the plank unbolted and to dismiss his marines for the day. It must be reiterated that the purpose of this military equipment was to train marines for combat. As Major Clarke testified: "[The NATO obstacle course] was put together to have obstacles that you may want — *you may need to negotiate during combat*. It is a variety of climbing, jumping, skills. . . ." J.A. 774 (emphasis added). Thus, this military equipment is integral to the Marine Corps' policy of effectively training Marines for combat while reducing unnecessary risks.[5]

---

[5]This critical fact is an important distinction between the facts of this case and *Gotha v. United States*, 115 F.3d 176 (3d Cir. 1997), which the dissent cites to support its position. In *Gotha*, the Third Circuit faced a challenge to the Navy's failure to provide a stairway with handrails and sufficient lighting on a public road. *Id.* at 178. There, where an employee of an independent contractor hired by the Navy to perform maintenance such as plumbing, carpentry, and roofing on the United States Naval UnderWater Tracking Range fell and was injured, *Gotha v. United States*, 929 F. Supp. 207, 209 (D.V.I. 1996) (overruled), the Third Circuit held that the discretionary function exception was not applicable. *Gotha*, 115 F.3d at 182.

However, the maintenance in *Gotha*, unlike that before us today, had no relation to the military or to national security, except that the roofs the independent contractors were hired to maintain were located on a military base. As the Third Circuit correctly found, "[t]his case is not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission." *Id.* at 181. Given that the purpose of the NATO obstacle course was to train marines for combat and *not* to simply facilitate exercise, the maintenance here clearly was related to national security. The Marine Corps' policy of effectively training Marines for combat while reducing unnecessary risks was implicated. Because of this distinction, this case is not about "mundane, administrative, garden variety, housekeeping" problems, and the result reached here is not at odds with that reached by the *Gotha* court. *Id.*

Further, we would note that *Gotha* appears to be somewhat at odds with our decision in *Bowman v. United States*, 820 F.2d 1393, 1395 (4th

Finally, SSgt. Raventos's decisions were grounded in Base policy. SSgt. Raventos testified that "[m]ost Marines and Navy personnel know that they need authorization to go to these courses and need a Navy corpsman available just in case injury happens." J.A. 900. He further testified that these rules constituted a "standing order." *Id.* at 901. In fact, Maj. Clarke had closed the obstacle course when the new plank was received. *Id.* at 780. As a result, anyone who, in accordance with military policy, made a formal request to use the course, would be denied. *Id.* Still further, the Base's Standard Operating Procedures for training areas, implemented to ensure the safe use and maintenance of the training areas, mandated that anyone who runs "any of the course, whether it's the NATO Obstacle or Confidence Course . . . needs to inspect the course before they run it." J.A. 664, 783.

Contrary to Hawes's assertions, we cannot view SSgt. Raventos's decision in a vacuum. Nor can we engage in the academic exercise of breaking down the completion of a task into pieces so infintesimal that we lose sight of the context in which those decisions were made. As was stated earlier, we must view any challenged decisions through the tinted lense of context to determine whether they are *susceptible* to policy analysis. In *Smith* we did just that. There, after finding that the repair/maintenance decisions regarding the escalators "implicated the ecopolicy of the METRO, i.e., whether it was more cost-effective to reassemble Escalator Three pending repair, or whether to wait until replacement parts arrived," *Smith*, 290 F.3d at 210, we found that the discretionary function exception protected not only the decisions to use one escalator as a stationary walker and the decision to leave another escalator disassembled, but also the decision "to provide no specific warning to its patrons of the situation at the station." *Id.* at 212. The same broad coverage must be applied in this case.

SSgt. Raventos was charged with repairing military equipment, which was a discretionary function. This fact mandates that we pro-

---

Cir. 1987), where we held that the failure of the National Park Service to erect a guardrail was a policy determination protected by the discretionary function exception. In fact, the Third Circuit recognized the factual similarity between the two cases. *Id.* at 182. While the Third Circuit was under no binding obligation to follow *Bowman*, its precedential value is obviously much greater in this court.

tect the underlying decisions integral to the exercise of that discretion.[6] Otherwise, we say to the military "you have the discretion to maintain military equipment but you don't have the discretion to determine how you do so." Importantly, we note that there is no allegation that Hawes's injuries were caused by actions or decisions falling outside the scope of said repairs. Thus, the result Hawes seeks would inject this court within the military chain of command and have us second guess SSgt. Raventos's decisions concerning the completion of a military task and the marines within his charge. We see no sound reason to navigate that minefield.

As such, we find that the district court did not err in finding that the decisions in question were protected by the discretionary function exception. The decision of the district court is therefore

*AFFIRMED.*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Because the majority applies the discretionary function exception in a way that drains the Federal Tort Claims Act of all meaning, I must respectfully dissent.

## I.

The Federal Tort Claims Act specifically authorizes suits against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," when the United States, "if a private person, would be liable." 28 U.S.C.A. § 1346(b)(1) (West 1993 & Supp. 2004). Thus, by enacting this legislation, Congress determined that "the United States should waive its historic defense of sovereign immunity and accept liability for the negligent conduct of government employees who are acting within the scope of their official duties." 14 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 3d* § 3658, at 529 (1998) (footnotes omitted).

---

[6]As the *Gaubert* court noted, the fact that they are operational in nature is of no consequence. See *Gaubert*, 499 U.S. at 325.

To "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy," *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984), the Act provides an exception to this waiver of sovereign immunity when government employees exercise a "discretionary function." 28 U.S.C.A. § 2680(a) (West 1994). The statute does not define what constitutes a discretionary function. But, the Supreme Court has established a two-step inquiry to discern whether the discretionary function exception applies. *See Berkovitz v. United States*, 486 U.S. 531, 536 (1988).[1]

As the first step, the court must determine whether the challenged conduct of a government employee "involves an element of judgment or choice" or whether "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* (citation omitted). The parties agree that no statute, regulation, or policy mandated the course of action taken here; thus the challenged acts involve some "matter of choice." *See id.*

Therefore, we must move to the second step of the *Berkovitz* inquiry, i.e., the determination of whether the challenged conduct is "of the kind that the discretionary function exception was designed to shield." *Id.* The exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537 (citation omitted). Moreover, in order to obtain the discretionary function shield, discretionary acts must further a public policy that the particular "regulatory regime seeks to accomplish." *United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991).

With these principles in mind, I turn to the case at hand.

---

[1] We have never squarely considered the question of which party bears the burden of proof in a discretionary function case. I see no reason for us to decide that question here because the outcome of this case does not depend on its answer. But, contrary to the majority's suggestion, "[a]lthough the plaintiff bears the initial burden of proving subject matter jurisdiction under the Federal Tort Claims Act, most courts have concluded that the burden of proving the applicability of the discretionary-function exception falls upon the United States." Wright, Miller & Cooper, *supra*, § 3658.1, at 639.

## II.

In this case, Rawls R. Hawes alleges that he suffered severe and permanent injuries because, as a result of the negligence of government employee Staff Sergeant Raventos, the Scale of Integrity's wooden plank was not firmly secured to its posts and there was inadequate warning of the danger. Hawes challenges SSgt. Raventos' decisions to: (1) place the heavy plank on, but unsecured to, posts ten feet above ground, even though the bolts he had ordered were too short; (2) dismiss the work crew at noon without remedying this situation, leaving the plank in an unreasonably "unsafe and hazardous condition" over a long holiday weekend; and (3) fail to provide "adequate and reasonable warnings" of this hazardous condition. *See* Am. Compl. ¶¶ 11-16.[2]

Rather than argue that these allegedly negligent decisions of SSgt. Raventos were grounded in regulatory policy, the Government asserts that "the decisions made by the *Marine Corps*" were grounded in policy. Brief of Appellee at 22 (emphasis added). According to the Government, the proper focus is not "on the actions performed by one individual," *id*. at 36, but on the "broader framework" of the *Marine Corps*' decisions, *id*. at 46, which, it claims, involved "(1) the creation and implementation of safety protocols for the use and maintenance of military unique equipment, operations and systems; and (2) the development and administration of a recreational program on base." *Id*. at 22.

Thus, the Government seeks to recast this case, focusing on the purportedly broad economic and political implications of the Marine Corps' decision to repair the NATO obstacle course rather than on the specific conduct of the person doing the repairs. Perhaps the Govern-

---

[2]At this stage of the proceedings, a court need not, and should not, consider whether SSgt. Raventos was in fact negligent. *See*, *e.g.*, *Duke v. Dep't of Agriculture*, 131 F.3d 1407, 1410 (10th Cir. 1997) (noting that "in applying the discretionary function exception we do not consider whether the decision or nondecision was negligent or wrong"). For that reason, SSgt. Raventos' substantive defense of his conduct, which the majority cites, seemingly with approval, *see ante* at 3 n.1, is at this juncture irrelevant.

ment has adopted this strategy because it recognizes the weakness of its argument that the discretionary function exception applies to SSgt. Raventos' decisions. In any event, the Supreme Court has rejected the Government's approach. The Court has explained that the "basic inquiry concerning the application of the discretionary function exception is whether the *challenged acts of a Government employee* — whatever his or her rank — are of the nature and quality that Congress intended to shield from tort liability." *Varig Airlines*, 467 U.S. at 813 (emphasis added).

Accordingly, as the majority recognizes, the proper focus is not on the Marine Corps' decision to repair the Scale of Integrity but on SSgt. Raventos' specific conduct. *See ante* at 8 (explaining that "we focus on SSgt. Raventos's decisions to cease the repair of the Scale of Integrity until after the weekend holiday and the alleged failure to warn adequately").[3] The majority, however, going beyond even what the Government was willing to argue, holds that SSgt. Raventos' conduct "involves the allocation and management of scarce military resources," thereby "implicat[ing] economic policy" and triggering the exception. *Ante* at 11. In other words, incredibly, the majority concludes that SSgt. Raventos' decision to leave a large heavy plank used for exercise unbolted to its posts ten feet above the ground without an adequate warning over a long weekend was "grounded in regulatory policy." *See Gaubert*, 499 U.S. at 325 n.7.

In so holding, the majority allows the discretionary function exception to swallow the Federal Tort Claims Act's waiver of sovereign immunity. This holding, of course, is at odds with the judgment of Congress, reflected in the Act, that the government will generally accept responsibility for the negligence of its employees when they act within the scope of their employment.

---

[3]This does not mean that a court should attempt to discern the "subjective intent" underlying challenged acts. *See Gaubert*, 499 U.S. at 325. Rather, we "look to the nature of the challenged decision[s] in an objective, or general sense, and ask whether th[ose] decision[s] [are] one[s] which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 720-21 (4th Cir. 1993).

Moreover, the Supreme Court has expressly disavowed such a holding. The Court has instructed that "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception." *Gaubert*, 499 U.S. at 325 n.7. These are acts that "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Id.* For example, the *Gaubert* Court noted that if one of the federal bank regulators in the case before it, while on official business, drove his car negligently and thereby caused an accident, the discretionary function exception "would not apply." *Id.* This is so, the Court explained, because even though "driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Id.*

So it is here. Certainly, deciding to leave a heavy wooden exercise plank unbolted to ten-foot high posts over a long weekend without adequate warning calls for the exercise of discretion. But the exercise of that discretion "can hardly be said to be grounded in" public policy. *See id.* SSgt. Raventos' decisions may have tangentially "involve[d]" the allocation and management of military resources, *ante* at 11, just as the *Gaubert* driver's negligent acts may have tangentially "involve[d]" the allocation and management of federal bank regulatory resources; but SSgt. Raventos' decisions were no more "grounded in" military policy than the decisions of the negligent driver in *Gaubert* were "grounded in" banking regulatory policy. *See Gaubert*, 499 U.S. at 325 n.7. SSgt. Raventos' decisions, like those of the negligent driver, were simply not judgments "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.

The majority attempts to distinguish *Gaubert* (and other precedent) from the case at hand seemingly on the basis of its own determination that SSgt. Raventos was repairing "military equipment" somehow unique and "integral" to "train[ing] Marines for combat." *See ante* at 10 n.4, 11 & n.5, 12. But, although the Government does contend that the obstacle constituted "military unique equipment, " the district court never resolved this question. *See Hawes v. United States*, 322 F. Supp. 2d 638, 644 n.9, 645 (E.D. Va. 2004). Thus, to the extent that the majority resolves this factual issue in the first instance, it commits basic and fundamental error. *See, e.g.*, 5B Wright & Miller,

*Federal Practice and Procedure: Civil 3d*, § 1350, at 255-264 (2004) (and cases cited therein).

Furthermore, even if an appellate court had the power to make this factual finding, it would be impossible to do so fairly at this juncture. Whether the obstacle actually did constitute "military unique equipment" that was "integral" to "train[ing] Marines for combat" is so fiercely contested at present that further evidentiary development is necessary. The Marine Corps manual on which the Government relies defines "military-unique equipment" as "[e]quipment and systems that are unique to the national defense mission," such as "military weapons, aircraft, ships, submarines, missiles and missile sites, early warning systems and sites, military space systems, ordnance, tanks, and tactical vehicles," without mention of obstacles or exercise equipment. J.A. 652. Moreover, the record evidence of wide public access to the obstacle suggests that it was not "unique to the national defense mission": in response to Hawes' interrogatory asking the Government to identify *all* relevant restrictions on civilian access to the obstacle, the Government conceded that at the time of the accident, Camp Barrett, where the obstacle is located, was an "open base" that "anyone [could] drive on or off without passing an armed sentry post." J.A. 1004.[4]

Finally, even if the majority could resolve in the first instance a hotly disputed factual question and could fairly find on the present record that the obstacle constituted "military unique equipment," it would make no difference in this case. The discretionary function exception would not shield SSgt. Raventos' assertedly negligent repair decisions even if the obstacle he was repairing was "military unique equipment" any more than the exception would shield the *Gaubert* bank regulator's negligent driving decisions even if the car he was driving was outfitted with "banking unique equipment" (for example, special computers). Like the *Gaubert* driver, SSgt. Raventos' decision to leave a heavy exercise plank — even one "military unique" — unbolted ten feet above the ground over a long weekend in the course of making ordinary repairs to it "can hardly be said to be grounded in" any public policy. *Gaubert*, 499 U.S. at 325 n.7. The

---

[4]This evidence also flatly contradicts the testimony of SSgt. Raventos and Major Clarke — which the majority cites approvingly — regarding access to the obstacle course. *See ante* at 12.

majority's utter failure to provide any legitimate basis for distinguishing SSgt. Raventos' alleged negligence from that of the driver in *Gaubert* confirms its misguided approach to this case.

III.

Nor, contrary to the majority's suggestion, does circuit precedent support its holding. In this circuit, we may have "interpreted the phrase 'public policy' broadly," *ante* at 8, but we have never held that garden-variety housekeeping decisions like those at issue here are "grounded in" public policy and protected by the discretionary function exception.

Indeed, examination of our precedent reveals that in every instance in which we have held the discretionary function exception to apply, the challenged government conduct constituted acts truly rooted in public policy. *See, e.g., Minns v. United States*, 155 F.3d 445, 452 (4th Cir. 1998) (inoculation of military servicemen against potential biological and chemical attack); *Baum*, 986 F.2d at 723 n.3, 724 ("design and construction" of guardrails over Baltimore-Washington Parkway); *Bowman v. United States*, 820 F.2d 1393, 1395 (4th Cir. 1987) ("design and use" of guardrails and signs along Blue Ridge Parkway); *see also Smith v. WMATA*, 290 F.3d 201, 208-09 (4th Cir. 2002) (utilization of escalator during "emergency situation" at METRO station). The challenged acts in these cases provide a striking contrast to the acts at issue here. In fact, in *Baum*, we recognized this difference, noting that "not . . . every maintenance decision of every government actor is so policy-based as to fall within the discretionary function exception." 986 F.2d at 724. Today's decision renders those words hollow.

In the case most similar factually to the one at hand, the Second Circuit concluded after careful analysis that a challenge to a government employee's asserted negligence in ordinary maintenance of prison weight equipment was not barred by the discretionary function exception. *See Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000). In *Coulthurst* an inmate sued the government for serious injuries he sustained while exercising on a lateral pull-down machine when the "cable connecting the steel pull-down bar to the weights snapped, bringing the bar down onto his shoulders and neck with

approximately 270 pounds of force." *Id.* at 107. The court held that "[u]nder various fair readings of the complaint," the prisoner's claim "involves negligence unrelated to any plausible policy objectives." *Id.* at 111. The court explained that a government inspector's laziness in failing to inspect the machine or "to notify the appropriate authorities upon noticing the damaged cable, are examples of negligence . . . that do not involve 'considerations of public policy.'" *Id.* (quoting *Gaubert*, 499 U.S. at 323). "Such actions do not reflect the kind of considered judgment 'grounded in social, economic, and political policy'" that the discretionary function exception shields "from 'judicial "second guessing."'" *Id.* (quoting *Varig Airlines*, 467 U.S. at 814).

The same must be said with respect to SSgt. Raventos' alleged negligence. It simply goes too far to hold that his decisions to hoist the obstacle's plank onto its posts even though the bolts he had ordered were too short, to dismiss his crew at noon without remedying the situation, and to leave the plank unbolted ten feet above ground over a long weekend without posting a prominent warning, reflect judgments "grounded in social, economic, and political policy" and shielded by the discretionary function exception.

Our sister circuits have recognized this, concluding that similar non-policy-based government acts are not protected by the discretionary function exception. Indeed, as one court has noted, a holding that "torts stemming from garden variety decisions fall outside the discretionary function exception is consistent with a primary motive behind the [Federal Tort Claims Act]." *Cestonaro v. United States*, 211 F.3d 749, 755 (3d Cir. 2000) (holding asserted negligence in failure to provide adequate lighting or warning in federally controlled parking lot not shielded by discretionary function exception). Since "[t]he question" as to whether the discretionary function exception applies "is not whether there is any discretion at all, but whether the discretion is *grounded* in the policy of the regulatory regime," the proper analysis looks to "whether the decision is fraught with economic, political, or social judgments." *Cope v. Scott*, 45 F.3d 445, 449-50 (D.C. Cir. 1995) (internal quotation marks and citation omitted) (holding that asserted failure to post adequate warning signs along commuter road not shielded by discretionary function exception); *see also Boyd v. United States*, 881 F.2d 895, 898 (10th Cir. 1989) (holding that asserted failure to warn of danger in offshore swimming area "does

not implicate any social, economic, or political policy judgments with which the discretionary function exception properly is concerned"). The decisions of SSgt. Raventos challenged here are no more "fraught with economic, political, or social judgments," *Cope*, 45 F.3d at 450 (internal quotation marks omitted), than were those at issue in *Coulthurst*, *Cestonaro*, *Cope*, or *Boyd*.

Finally, notwithstanding the majority's suggestion to the contrary, SSgt. Raventos' status as a military officer does not transform his ordinary workaday decisions into ones of "'military discretion'" due special deference. *Ante* at 10 (quoting *Minns*, 155 F.3d at 451 (citing *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991))). As the cases relied on by the majority make clear, deference is due only when "discretionary decisions are ones of *professional* military discretion," like the determination that inoculation against biological or chemical attack is warranted, *Minns*, 155 F.3d at 451 (emphasis added), or the determination of what constitutes appropriate "defense of national borders." *Tiffany*, 931 F.2d at 278. This case simply does not involve the exercise of "professional military discretion."

As the Third Circuit held in rejecting the argument that the discretionary function exception barred a negligence claim against the government for the conduct of a Navy employee:

> This case is not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get.

*Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997) (holding discretionary function exception is no shield to claim of negligence in failing to provide handrails or adequate lighting on footpath). These words are equally applicable here. The *Gotha* Court found it "difficult to conceive of a case more likely to have been within the contemplation of Congress when it abrogated sovereign immunity" than the one before it. *Id.* at 182. An appropriate application of the discretionary function exception leads to precisely the same conclusion in this case.

## IV.

The discretionary function exception serves the important purpose of protecting the government from tort suits that challenge its policy-making authority. But when the exception is used to shield the government from liability resulting from ordinary garden-variety negligence not "grounded in" any public policy, it subverts the very purpose of the Act. As the Supreme Court has recognized, certain decisions, even though made in connection with "official duties" and even though discretionary in nature, are not shielded by the discretionary function exception because "the decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Gaubert*, 499 U.S. at 325 n.7. The acts challenged here involve precisely such non-policy-grounded decisions. The majority's contrary holding makes it hard to imagine any situation involving a discretionary decision other than one resulting in a traffic accident in which the government would be subject to suit for employee negligence. Clearly, that could not have been Congress' purpose in enacting the Federal Tort Claims Act.