**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 15, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JORGE ORTIZ, as next friend and
parent of I.O., a minor,

       Plaintiff - Appellant,

    v.

UNITED STATES OF AMERICA, by
and through Evans Army Community
Hospital,

       Defendant - Appellee.

No. 13-1500

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:12-CV-01731-PAB-KMT)**

---

Laurie M. Higginbotham, Whitehurst, Harkness, Brees, Cheng, Alsaffar &
Higgonbotham, P.L.L.C., Austin, Texas (James E. Puga, Sean B. Leventhal, and
Benjamin I. Sachs, Leventhal, Brown & Puga, P.C., Denver, Colorado, and Joseph
F. Bennett, Cross & Bennett, L.L.C., Colorado Springs, Colorado, with her on the
briefs) for Appellant.

Lowell V. Sturgill, Jr., Attorney (Stuart F. Delery, Assistant Attorney General,
John F. Walsh, United States Attorney, and Marleigh D. Dover, Attorney, with
him on the brief), Civil Division, Appellate Staff, Department of Justice,
Washington, D.C., for Appellee.

---

Before **TYMKOVICH**, **EBEL**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

This case requires us to consider whether the federal government is immune from damages for injuries its agents caused to an active-duty servicewoman's baby during childbirth. Our resolution of the issues is controlled by the Supreme Court's decision in *Feres v. United States*, which found that military service members were barred from bringing claims against the government under the Federal Tort Claims Act (FTCA) for injuries incident to their military service. In the many decades since its inception, criticism of the so-called *Feres* doctrine has become endemic. That criticism is at its zenith in a case like this one—where a civilian third-party child is injured during childbirth, and suffers permanent disabilities.

Under the *Feres* doctrine, federal courts lose their subject matter jurisdiction over claims like this because we conclude the injured child's in utero injuries are unmistakably derivative of an injury to her mother, an active duty Air Force captain, who gave birth at a Fort Carson Army Base hospital. To be sure, the facts here exemplify the overbreadth (and unfairness) of the doctrine, but *Feres* is not ours to overrule. Applying controlling law, the government is not liable under the FTCA for the claims of negligence in this case.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the district court's decision.

# I.  Background

Captain Heather Ortiz was an active-duty service member in the United States Air Force.  In March 2009, Captain Ortiz was admitted to Evans Army Community Hospital[1] for a scheduled Caesarean section.  Complications caused by the medical staff's administering of drugs in preparation for the surgery caused a precipitous drop in Captain Ortiz's blood pressure, leading to hypotension.  As a result of Captain Ortiz's hypotension, her baby, "I.O.," was deprived of oxygen in utero, leading to severe injuries.

Plaintiff here is George Ortiz, Captain Ortiz's husband, who, as the parent of I.O., filed a lawsuit against the United States, seeking compensation for I.O.'s injuries, her long-term medical care, and her life-care needs.  According to the complaint, in advance of the Caesarian section, one of the hospital's nurses gave Captain Ortiz the trade drug Zantac, which is commonly used to prevent aspiration of gastric acid during labor or surgery.  But as was apparent in Captain Ortiz's hospital records, she was allergic to this drug and she suffered an allergic reaction to the provided dose soon after it was administered.  To counteract the allergy, a doctor ordered that Captain Ortiz receive a dose of Benadryl.  The Benadryl caused an immediate drop in Captain Ortiz's blood pressure, resulting in

---

[1]   The hospital, which is owned and operated by the government, is located in Colorado Springs on the Fort Carson Army base and provides medical services and benefits primarily to military personnel and retirees, and their families.

hypotension, an injury that occurs when blood flow is inadequate to perfuse the uterus and the placenta. Captain Ortiz's hypotension resulted in severe injuries to I.O., including brain trauma that caused cerebral palsy.

In addition, the complaint alleges that personnel at the hospital were negligent in failing to scrutinize the fetal monitoring strips following Captain Ortiz's allergic reaction and the attendant consequences. Fetal monitoring strips refer to the graphical representation of the fetus's heart rate during labor. Captain Ortiz alleges that had the hospital personnel timely reviewed the monitoring strips, they could have prevented I.O.'s injuries.

Finally, the complaint alleges that the hospital staff members were "negligent with regard to their care and treatment of Heather Ortiz and I.O." *See* App. at 19; *see also id.* at 19 ¶ 65 ("The medical care providers . . . did not appropriately provide care and treatment concerning Heather Ortiz's blood pressure problem."); *id.* at 21 ¶ 77 ("These Defendants deviated from the standard of care and were negligent in . . . failing to properly monitor and treat I.O. [sic] condition."); *id.* at 19 ¶ 71 ("These providers . . . were negligent with regard to their care and treatment of Heather Ortiz and I.O.").

The government filed a motion to dismiss for lack of subject matter jurisdiction, raising the bar to claims under the FTCA first established in *Feres v. United States*, 340 U.S. 135 (1950). The government also moved to stay discovery pending the district court's decision on the motion to dismiss the

-4-

complaint because the *Feres* doctrine is classified as jurisdictional and thus a ruling could dispose of the case without any discovery.

The district court agreed with the government that plaintiff's claims were precluded by *Feres*. In doing so, the district court recognized limited authority with respect to handling third-party *Feres* claims, especially those related to fetal injuries. Nevertheless, applying each of the several standards adopted in other circuits, and reaching the same result regardless of which it applied, the district court found that *Feres* barred plaintiff's claims related to both the negligent dispensation of the Zantac and the Benadryl, and the observation of the fetal monitoring strips.

## II. Analysis

We address first whether the district court correctly found that it lacked subject matter jurisdiction over plaintiff's claims because of the *Feres* doctrine. We find that the district court did not err, and, over the course of evaluating this jurisdictional question, we further explain this circuit's case law on the *Feres* doctrine, particularly as it applies to third-party claims brought by civilians.

### A. Subject Matter Jurisdiction

Because the question of subject matter jurisdiction is partially intertwined with an aspect of the merits of plaintiff's claims here, we proceed under a summary-judgment standard. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Thus, our review is de novo, and plaintiff "must present . . . evidence

-5-

sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *Robinson v. Union Pac. R.R.*, 245 F.3d 1188, 1191 (10th Cir. 2001) (quoting *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 n.5 (10th Cir. 1999)). We can only affirm if there is no genuinely disputed issue of material fact concerning jurisdiction. *See Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000).

The question of whether sovereign immunity exists "is jurisdictional in nature." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Id.* Although the FTCA constituted an expansive waiver of the federal government's sovereign immunity for torts committed by government actors, several exemptions apply. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218 (2008). When an exemption applies, we revert to the baseline application of the government's sovereign immunity, which deprives the federal courts of jurisdiction. *See Garcia v. U.S. Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008). The *Feres* doctrine is one such exemption.

### 1. The **Feres** *Doctrine*

Since 1950, courts have analyzed tort lawsuits brought by service members against the government under the standards set forth in *Feres v. United States*, 340 U.S. 135 (1950). In that case, the Supreme Court considered several lawsuits seeking recovery for injuries or deaths of servicemen caused by the negligence of

fellow military employees acting on behalf of the government. Each serviceman-plaintiff contended that the broad waiver of sovereign immunity under the FTCA provided their recourse toward recovery, even though the injuries were sustained during activities associated with their service. *Id.* at 137.

The Supreme Court, however, found the FTCA does not apply in such cases. Instead, the Court crafted a limited judicial exception to the federal government's broad waiver of sovereign immunity under the FTCA. *Id.* at 146. In particular, the Court exempted from the scope of that statute "injuries to servicemen where the injuries *arise out of or are in the course of activity incident to service.*" *Id.* (emphasis added). This limitation is now known as the *Feres* doctrine.

In these cases, the crucial question involved in examining whether a service member is barred from recovery under the FTCA is resolving whether the injury was "incident to service." The incident-to-service test applies "consistently to bar all suits on behalf of service members against the Government based upon service-related injuries." *United States v. Johnson*, 481 U.S. 681, 687–88 (1987). The incident-to-service test, however, is neither self-defining nor readily discernible from the language of *Feres* or *Johnson*.

In our application of *Feres*, we have explained that, regardless of its precise contours, the incident-to-service test applies broadly:

-7-

> In recent years, the Supreme Court has broadened *Feres* to the point where it now encompasses, at a minimum, *all injuries suffered by military personnel that are even remotely related to the individual's status as a member of the military*. Courts applying the *Feres* doctrine have given a broad reach to *Feres*' "incident to service" test and have barred recovery by members of the armed services for injuries that at first blush may not have appeared to be closely related to their military service or status. *Practically any suit that implicates the military's judgments and decisions runs the risk of colliding with Feres*.

*Pringle*, 208 F.3d at 1223–24 (emphasis added) (quotations, citations, and alterations omitted). Our general view is the dominant understanding of *Feres*.

Notwithstanding a consensus on the *Feres* doctrine's potency as a general matter, the Supreme Court and lower courts alike have consistently wrestled with the mechanics of its application to particular facts. In the early years after its adoption, courts focused on the underlying purposes for the doctrine to determine whether application to a given fact pattern furthers those reasons. *See Ricks v. Nickels*, 295 F.3d 1124, 1128 (10th Cir. 2002). Courts articulated several rationales—often called "special factors"—for *Feres*'s existence. *Id.* Based loosely on *Feres*, courts looked to three general policies: "(1) the distinctly federal nature of the relationship between the government and members of its armed forces; (2) the availability of alternative compensation systems; and (3) the

fear of damaging the military disciplinary structure." *Walden v. Bartlett*, 840

F.2d 771, 773 (10th Cir. 1988) (internal quotation marks and citation omitted).[2]

In many jurisdictions, the extent to which these factors still bear on the

*Feres* analysis is an open question.  In some cases, a gradual chipping away at

factors (1) and (2) left a solitary reason at the heart of *Feres*: whether allowing

the lawsuit to proceed would disrupt the unique hierarchical and disciplinary

structure of the military.  *See United States v. Shearer*, 473 U.S. 52, 57–58 & n.4

(1985); *see also Ritchie v. United States*, 733 F.3d 871, 874 (9th Cir. 2013), *cert.*

*denied*, 134 S. Ct. 2135 (2014) ("Although the Supreme Court has offered

inconsistent guidance about how *Feres* should be applied . . . we have

consistently emphasized the third rationale.").[3]  But that constriction has not at all

---

[2] In *Feres*, the Court also acknowledged that the absence of parallel private liability supported excluding service-member injuries from the FTCA waiver.  *See Feres*, 340 U.S. at 146.  This rationale did not last five years.  *See United States v. Brown*, 348 U.S. 110, 112 (1954) (rejecting the parallel-private-liability argument).

[3] The Ninth Circuit further paved its own course, latching onto the Supreme Court's warning that the *Feres* doctrine "cannot be reduced to a few bright-line rules; each case must be examined in light of the statute as it has been construed in *Feres* and subsequent cases."  *Shearer*, 473 U.S. at 57.  Bearing this in mind, the Ninth Circuit constructed a series of factual predicates that clue to whether a given injury was incident to service: "In cases where the existence of a *Feres* bar is not clear, we have looked to four factors to determine whether an activity is incident to military service: (1) the place where the negligent act occurred; (2) the duty status of the plaintiff when the negligent act occurred; (3) the benefits accruing to the plaintiff because of his status as a service member; and (4) the nature of the plaintiff's activities at the time the negligent act occurred."  *Dreier v. United States*, 106 F.3d 844, 848 (9th Cir. 1997) (paragraph

(continued...)

been uniform, and even very recent cases have stressed that the Supreme Court's guidance requires that all the *Feres* factors must still be analyzed to determine whether the claims are prohibited.  *See, e.g.*, *Purcell v. United States*, 656 F.3d 463, 465–66 (7th Cir. 2011) (recognizing that all three *Feres* rationales still apply).

Our circuit has simplified the equation, concluding that all the special factors "effectively merged . . . with the incident to service test."  *Ricks*, 295 F.3d at 1130.  We credited the Supreme Court's decision in *United States v. Stanley*, 483 U.S. 669 (1987), as articulating "that the incident to service test rests squarely on the third 'special factor' of preserving the military's disciplinary structure and Congress' prerogative in regulating intramilitary affairs."  *Ricks*, 295 F.3d at 1130 (citing *Stanley*, 483 U.S. at 683).  But we also stressed that the incident-to-service test does not permit an inquiry into how military discipline is "affected in a particular case," because that inquiry itself would be an impermissible intrusion into military affairs.  *Id.*  In the end, we essentially rejected any focus on the special factors, finding them unduly redundant, and returned the analysis to the inquiry that *Feres* originally set forth: whether the injury was "incident to service."  *Tootle v. USDB Commandant*, 390 F.3d 1280, 1282 (10th Cir. 2004) ("Rather than focusing on the presence or absence of the

---

³(...continued)
format altered).

*Feres* rationales . . . the relevant question is whether [plaintiff's] alleged injuries arose 'incident to service.'").

With all of this confusion and lack of uniform standards, it comes as no surprise that the *Feres* doctrine, while the law of the land, has received steady disapproval from the Supreme Court on down. An early and vociferous critique came from Justice Scalia in dissent in *Johnson*, where he stated that "*Feres* was wrongly decided and heartily deserves the widespread, almost universal criticism it has received." *Johnson*, 481 U.S. at 700 (Scalia, J., dissenting) (internal quotation marks omitted). Justice Scalia (joined by three other Justices) found the *Feres* special factors lacking in textual support in the FTCA and devoid of logic. *See id.* at 694–700. This dissent has provided the cornerstone in the foundation for *Feres* detractors, and it has been widely praised. *See, e.g.*, *Taber v. Maine*, 67 F.3d 1029, 1044 (2d Cir. 1995) (applauding Justice Scalia's dissent as a persuasive rebuttal to the *Feres* doctrine).[4]

Because the dissent in *Johnson* and many other appellate-court decisions survey the doctrinal concerns *Feres* presents, we do not do so here. Suffice it to say that when a court is forced to apply the *Feres* doctrine, it frequently does so with a degree of regret. *See, e.g.*, *Ritchie*, 733 F.3d at 874 ("For the past sixty-

---

[4] Recently, in fact, Justice Thomas dissented from the denial of certiorari in a case that asked the court to overrule *Feres*, suggesting that, "at a bare minimum, it should be reconsidered." *See Lanus v. United States*, 133 S. Ct. 2731, 2732 (2013) (Thomas, J., dissenting from the denial of certiorari).

three years, the *Feres* doctrine has been criticized by countless courts and commentators across the jurisprudential spectrum." (internal quotation marks and citations omitted)); *Purcell*, 656 F.3d at 465 ("The *Feres* doctrine, while currently viable, is certainly not without controversy . . . and has also been widely criticized."); *Regan v. Starcraft Marine, LLC*, 524 F.3d 627, 633 (5th Cir. 2008) ("This [*Feres*] doctrine has been much-criticized."); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1341 (11th Cir. 2007) ("The *Feres* doctrine has been controversial, even as applied to the government . . . [b]ut . . . *Feres* remains the law."); *Costo v. United States*, 248 F.3d 863, 869 (9th Cir. 2001) ("[W]e apply the *Feres* doctrine here without relish. Nor are we the first to reluctantly reach such a conclusion under the doctrine. Rather, in determining this suit to be barred, we join the many panels of this Court that have criticized the inequitable extension of this doctrine to a range of situations that seem far removed from the doctrine's original purposes."); *Hinkie v. United States*, 715 F.2d 96, 97 (3d Cir. 1983) ("We are forced once again to decide a case where we sense the injustice of the result but where nevertheless we have no legal authority, as an intermediate appellate court, to decide the case differently." (quotation marks and footnote omitted) (alteration incorporated)).

This circuit long ago expressed the same sentiment: "Although many courts have expressed reservations about the continuing validity of the broad *Feres* doctrine, only the United States Supreme Court can overrule or modify *Feres*

. . . . Therefore, once again we are constrained to follow the *Feres* doctrine, notwithstanding its harsh result." *Labash v. U.S. Dep't of Army*, 668 F.2d 1153, 1156 (10th Cir. 1982); *see also Tootle*, 390 F.3d at 1282–83.

In summary, based on our decision in *Ricks*, the incident-to-service test as originally enunciated in *Feres* (and independent of the other so-called *Feres* rationales) is the standard that we apply here. To fully resolve this case, however, we must move beyond the traditional *Feres* claim because Captain Ortiz is not a plaintiff; I.O., a civilian, is. And so, we next analyze the framework for addressing claims asserted by civilian third parties that arise out of injuries to a service member.

### 2. *Third-Party* Feres *Claims*

From its inception, *Feres* has applied to cases beyond those brought by service members to recover for their own injuries. In fact, *Feres* itself dealt with two wrongful-death actions brought by the widows of servicemen. But questions lingered regarding the extent to which *Feres* could uniformly bar recovery for injuries to third parties in circumstances where the genesis of the third-party injury was intimately associated with injuries to service members.

#### Stencel Aero

The Supreme Court analyzed those questions in *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666 (1977). In that case, the Court found that *Feres* applied equally to a claim against the United States brought by the

manufacturer of an ejection seat, the malfunction of which had caused a serviceman's injuries. The serviceman had sued Stencel, the manufacturer, and the United States for permanent injuries that occurred when the ejection seat in his military plane failed during a midair exercise. Stencel responded by cross-claiming the United States for indemnity, and the United States raised *Feres* as a jurisdictional bar. The Court sided with the government, finding that "the third-party indemnity action in this case is unavailable for essentially the same reasons that the direct action by [the serviceman] is barred by *Feres*." *Id.* at 673.

We have applied this rule to civilian third-party claims beyond a garden-variety indemnification suit. Thus, for example, we have denied jurisdiction where the civilian wife of a serviceman brought claims against the government on account of her husband's negligent vasectomy. *Harten v. Coons*, 502 F.2d 1363 (10th Cir. 1974). Similarly, we have prohibited the daughter of a serviceman from bringing claims for injuries deriving from her father's military service in Vietnam. *See Heffington v. Dep't of Defense of the U.S.*, 248 F. App'x 952 (10th Cir. 2007).

Other courts have also interpreted *Stencel Aero* broadly to "preclude[] suits by third parties that derive—directly or indirectly—from injuries to service members incident to military duty." *Brown v. United States*, 462 F.3d 609, 612 (6th Cir. 2006). In fact, on the heels of *Stencel Aero*, every other circuit has

-14-

acknowledged that *Feres* applies to third-party claims brought by civilians beyond the standard indemnification claim.[5]

The analysis in *Stencel Aero* became what is now known as the "genesis test." Application of the genesis test sought to provide a reasoned standard for the question common to all third-party *Feres* claims; namely, to what extent are injuries to civilian third parties that arise out of circumstances concerning the service member's relationship with the military also barred under the FTCA?

To this end, the genesis test asks whether the civilian injury has its origin in an incident-to-service injury to a service member. *See, e.g.*, *Ritchie*, 733 F.3d at 875. If it does, then *Feres* applies as a bar to the third-party claim, just as it would to a claim by the service member for his or her injuries. *See Minns v. United States*, 155 F.3d 445, 449 (4th Cir. 1998) ("Under this test, if a nonserviceman's injury finds its 'genesis' in the injury suffered by a serviceman incident to service, then the *Feres* doctrine bars the non-serviceman's suit.").

---

[5] *See Minns v. United States*, 155 F.3d 445 (4th Cir. 1998); *Mossow v. United States*, 987 F.2d 1365 (8th Cir. 1993); *Smith v. United States*, 877 F.2d 40 (11th Cir. 1989); *Irvin v. United States*, 845 F.2d 126 (6th Cir. 1988); *In re Agent Orange Litig.*, 818 F.2d 201 (2d Cir. 1987); *West v. United States*, 744 F.2d 1317 (7th Cir. 1984) (en banc); *Hinkie v. United States*, 715 F.2d 96 (3d Cir. 1983); *Gaspard v. United States*, 713 F.2d 1097 (5th Cir. 1983); *Lombard v. United States*, 690 F.2d 215 (D.C. Cir. 1982); *Monaco v. United States*, 661 F.2d 129 (9th Cir. 1981); *DeFont v. United States*, 453 F.2d 1239 (1st Cir. 1972).

### *The Genesis Test's Injury Focus*

Despite the near-universal adoption of the genesis test, our court has yet to apply it to the type of third-party claims we find here. As we explain, in light of our obligation to follow *Feres* and *Stencel Aero*, the genesis test is the appropriate mechanism to apply to third-party *Feres* claims involving derivative third-party injuries, including those occurring in utero. While we recognize that other circuits have not so inclusively utilized the genesis test for every third-party *Feres* claim, we are convinced that *Stencel Aero* dictates our decision in this case.

In addition, we find it persuasive that courts across the circuits find the genesis test helpful to adjudicate a wide array of third-party *Feres* claims.

*First*, circuit courts have employed the genesis test when considering whether children can recover for genetic injuries stemming from alleged government negligence in exposing their service-member fathers to radiation or chemical weapons. *See Minns*, 155 F.3d at 449; *Hinkie*, 715 F.2d at 98; *Laswell v. Brown*, 683 F.2d 261, 269 (8th Cir. 1982); *Monaco v. United States*, 661 F.2d 129, 133 (9th Cir. 1981). In *Minns*, for example, the Fourth Circuit explained why *Feres* precluded the claims of the wives and children of servicemen for genetic birth defects resulting from the military's negligent inoculation of the servicemen in an effort to immunize them from possible biological or chemical attacks during the Persian Gulf War. The court said that the government's conduct toward the servicemen "was the 'genesis' and the 'but for' cause of the

-16-

injuries to the wives and children." *Minns*, 155 F.3d at 450. Relying on *Feres*'s military-discipline rationale, the court found that "[i]f allowed to proceed, their suits would place the courts in exactly the position that the *Feres* doctrine was designed to avoid." *Id.* Other genetic-defect cases have likewise relied on this rationale as the reason for extending *Feres* to bar the third-party claims. *See, e.g.*, *Monaco*, 661 F.2d at 134 (dismissing third-party claims where "the court still must examine the Government's activity in relation to military personnel on active duty").

*Second*, an even more clear-cut application of the genesis test occurs when the relative of a service member sues for loss of consortium or mental anguish when the government negligently causes the service member's death or injury. *See Kendrick v. United States*, 877 F.2d 1201, 1206–07 (4th Cir. 1989); *De Font v. United States*, 453 F.2d 1239, 1240 (1st Cir. 1972). By their very legal nature, these claims are "ancillary or derivative to an injury to a serviceman incident to military service" and thus cannot proceed under *Feres*. *Lombard v. United States*, 690 F.2d 215, 226 (D.C. Cir. 1982) (internal quotation marks omitted).

But courts have inconsistently described the threshold or starting point for scrutiny of a civilian plaintiff's claims under the genesis test—sometimes underscoring the government's negligent conduct and other times the service

-17-

member's injury.[6]  While the courts are not united, we appreciate that only the latter approach conforms with *Feres* and *Stencel Aero*.  Indeed, this injury-focused approach asks first whether there was an incident-to-service injury to the service member, *Feres*, 340 U.S. at 144, and second whether the injury to the third party was derivative of that injury, *Stencel Aero*, 431 U.S. at 673–74.  A negative answer to either question permits a complaint to survive dismissal for lack of subject matter jurisdiction under *Feres*.

We thus apply the injury-focused approach, finding that it is more faithful to *Feres* and *Stencel Aero*, the precedential cases binding on this court.  By the same

---

[6]  In *Minns*, for instance, the Fourth Circuit focused on the target of the government's negligent conduct as the key consideration.  According to that court, where the negligent act or behavior was directed at the service person, then any injuries that had their genesis in that negligence, even those to third parties, were barred by *Feres*.  *See Minns*, 155 F.3d at 450 ("This negligence in implementing and administrating the program to the servicemen thus was the "genesis" and the "but for" cause of the injuries to the wives and children."); *see also Matthew v. United States*, 452 F. Supp. 2d 433, 442 (S.D.N.Y. 2006) ("The relevant inquiry is not, therefore, who is injured and when the injury becomes manifest, but rather the time and nature of the negligent act alleged.").

But in *Lombard*, the D.C. Circuit focused instead on whether there was an actual injury to the serviceman that, based on typical causation principles, ultimately generated an injury to the third party.  There, the plaintiffs claimed that government negligence during its oversight of the "Manhattan Project" in New Mexico allowed Mr. Lombard, a member of the Army, to handle radioactive substances, which negatively altered his genetic makeup.  As a result, his children were born with physical defects.  Relying on *Stencel Aero*, the court found that "*Feres* has also been held to bar cases brought by third parties . . . where the claim originates with or derives from an *injury* to a serviceman incident to military service."  *Lombard*, 690 F.2d at 219 (emphasis added); *see also Adkins v. United States*, 869 F.2d 593, at *2 (4th Cir. 1989) (unpublished table decision).

-18-

token, we reject the object of the negligence or the target of the medical treatment as linchpins in analyzing third-party *Feres* claims.[7]

Our task in this case would be difficult enough if we simply had to navigate the conflicting interpretations of *Feres* and the genesis test. But an additional (and significant) variable requires further explanation: the fact that I.O.'s injuries were suffered in utero. With that in mind, we next discuss the nature of the in utero cases.

### 3. *In Utero Cases*

As a threshold matter, claims for fetal injuries brought by the offspring of servicewomen ordinarily do not pose substantial doctrinal questions under *Feres*'s genesis test. After all, such causes of actions are third-party civilian claims against the government, typical of the sort that invite a *Feres* inquiry into whether the third-party injury derives from a service person's incident-to-service injury.

But to counterbalance the harsh results often associated with the application of *Feres* to third parties, some courts have resisted the genesis test in prenatal cases. *See, e.g.*, *Brown*, 462 F.3d at 616; *Mossow v. United States*, 987 F.2d 1365, 1369–70 (8th Cir. 1993); *Romero v. United States*, 954 F.2d 223, 226 (4th Cir. 1992); *Del Rio v. United States*, 833 F.2d 282 (11th Cir. 1987); *Lewis v. United*

---

[7] There is no reason to categorically exclude consideration of these factors when divining the source of the third-party injury. But, contrary to the comprehensive treatment-focused approach adopted by some circuits, we emphasize the primacy of identifying an injury to a service member and tracing the third-party injury to it as the crucial elements.

*States*, 173 F. Supp. 2d 52, 56–57 (D.D.C. 2001), *vacated in part on other grounds*, 290 F. Supp. 2d 1 (D.D.C. 2003). These courts justify an "in utero exception" because there is either no injury to the mother or, in fewer cases, injuries to the mother and to the fetus are unrelated. In either scenario, the fetus's injury must be independent—that is, it cannot be derivative of the service member's nonexistent or wholly separate injury.

But this rule is not really an "exception" at all; rather, the upshot of the genesis test in such situations is that the third-party injury *did not* have its genesis in an incident-to-service injury to the service person.[8] By its very terms, the genesis test under *Feres* will never bar a third party's claim absent a service-member injury. And where there is a clear severability between the injuries to the fetus and those to the mother, the genesis test will likewise not preclude recovery.

### *The Nature of In Utero Injuries*

A number of cases have analyzed in utero injuries under the *Feres* doctrine. And like with the genesis test more generally, these courts have struggled to ascertain the crux of the genesis test for in utero injuries, disagreeing about

---

[8] Plaintiff alleges that the in utero exception is an entirely separate rule from the genesis test that applies to cases involving fetuses. Due to some conflicting case law, this classification makes some sense but is irrelevant in any event. Because the totally independent injury to the fetus is a raison d'etre for the in utero rule, it serves to negate the derivativeness that is required for the genesis test. As we have said, properly construed, the in utero exception is better described as a particular class of cases under which application of the genesis test reveals an independent third-party injury not barred by *Feres*.

-20-

whether the starting point is an injury to the service member or simply treatment directed at or for the benefit of the service member.

Plaintiff here oscillates between these approaches, urging that we consider a narrow application of *Feres* for claims by infants injured during childbirth under either standard. Based on the cases from other circuits, plaintiff's hedging is understandable, and the Sixth Circuit's decision in *Brown* is a useful illustration of the interaction between the competing principles. *See* 462 F.3d at 611–16. In that case, the court was forced to grapple with its circuit's own precedent, *Irvin v. United States*, 845 F.2d 126 (6th Cir. 1988), which had broadly adopted the genesis test for in utero injuries because "[t]he treatment accorded [to a fetus's] mother is inherently inseparable from the treatment accorded . . . [to] a fetus in his mother's body." *Brown*, 462 F.3d at 617 (quoting *Scales v. United States*, 685 F.2d 970, 974 (5th Cir. 1982)). To break away from this authority, the *Brown* court cited with approval the collection of in utero cases, "conclud[ing] that the child's FTCA claim was not barred by *Feres* because the child had sustained an independent injury." *Id.* at 613 ("[S]ome of the cases are factually similar to the case before this Court in that they allege a negligent injury only to the child, rather than an injury to both the child and the service member."). It further distinguished *Irvin* because "the death of the *Irvin* infant was caused by (and was therefore derivative of) an injury suffered by the child's mother." *Id.* at 614. This made all of the difference in the world because, as the court repeatedly underscored,

"Deborah Brown sustained *no physical injury whatever* from the effects of the negligent prenatal treatment, from her pregnancy, or from Melody's birth." *Id.* at 611 (emphasis added). As we read the opinion, this focus on the injury permitted the Sixth Circuit to apply the genesis test, but escape the weight of *Irvin*'s seemingly broad holding and permit the military dependent to recover for her injuries.

*Brown*'s articulation of the service person's injury as the place to start is sound, and other courts have gravitated toward an injury-focused approach for cases involving fetal injuries. For example, in *Romero*, the Fourth Circuit found that "[i]n our view the relevant inquiry in a genesis analysis is whether a service member was injured, not whether the negligent act occurred during active duty service." *Romero*, 954 F.2d at 226. The court in *Romero* was persuaded in part by the fact that the military mother "suffered no physical injury as a result of the allegedly negligent conduct." *Id.* at 224. Similarly in *Mossow*, the Eighth Circuit noted that "[b]ecause [the baby's] injury is not derivative of an injury to a service member, we find his cause of action for legal malpractice is not barred by the genesis test under *Feres*." 987 F.2d at 1370.

And finally, the Ninth Circuit's recent decision in *Ritchie* convincingly explains why the only sustainable way to approach the genesis test is through a focus on the service member's injury itself. *Ritchie*, 733 F.3d at 877–88. In that case, the court applied the genesis test to dismiss claims for fetal injury brought

about because the fetus's servicewoman mother was forced, against doctor's orders, to participate in physical training while pregnant. The court first found that the in utero exception was inapplicable based on Ninth Circuit precedent, instead applying a version of the genesis test to find that examining the fetus's claim would involve second-guessing military orders and thus could not be maintained. *Id.* at 875–76. Addressing the plaintiff's urging that the court adopt the in utero exception, the court commented in dicta that the result would be unchanged. Indeed, the court found that "[o]nly where a fetus alone suffers injury can the claim survive *Feres*." *Id.* at 877–88 ("[A] civilian fetus's claim may only escape *Feres* if its servicewoman mother suffered no injury from the purportedly negligent acts.").

### *Other Approaches*

The injury-focused approach, however, has not gained universal acceptance in the in utero cases. For example, the district court in *Lewis* found a different result flowed from *Romero*, concluding that "[t]he crucial issue . . . is whether the negligent medical treatment leading to [the baby's] injury was provided to him or to his mother." *Lewis*, 173 F. Supp. 2d at 57.[9] But, at the very least, the internal

---

[9] *Lewis* and the Eleventh Circuit's decision in *Del Rio* are outliers to the extent that they found no *Feres* bar even when the fetus's injuries stemmed from an injury to the servicewomen mother. These cases are unfaithful to *Feres* for all of the reasons we discuss herein.

inconsistencies in *Romero* are evidence as to why the treatment-focused approach

is unworkable:

> Admittedly, in satisfying its duty of care to Joshua,
> proper prenatal treatment would have involved his
> mother's body.  The sole purpose of the treatment,
> however, would have been directed at Joshua.

> Mrs. Romero suffered from a congenital cervical
> weakness.  This condition apparently placed Joshua at
> risk of injury.  It did not, however, affect Mrs. Romero's
> health. Presumably her state of health would have been
> the same whether the physician placed the sutures or not.
> If the treatment had been administered, its sole purpose
> would have been directed at preventing injury to Joshua.
> The failure to place the sutures during the prenatal period
> and to cut them immediately preceding birth was the
> direct cause of the injuries to Joshua, a civilian.  Because
> the purpose of the treatment was to insure the health of a
> civilian, not a service member, *Feres* does not apply.

*Romero*, 954 F.2d at 225.  As this suggests, the difficulties in ascertaining the

beneficiary of the treatment are never more pronounced than in a case involving

mother and fetus.  It is difficult to comprehend how courts are well-positioned to

determine whether a particular negligent act was directed at the mother, at the

fetus, or at both.[10]

Faced with the dilemma of the inherently-inseparable nature of prenatal and

neonatal treatment, the *Romero* court strained to demonstrate that the

---

[10] Even some cases that ultimately applied *Feres* as a bar to third-party
claims misguidedly stressed the importance of the target of the negligence. *See
Scales*, 685 F.2d at 974 ("In cases that allow the dependents of servicemen to sue
the government, the negligent conduct is directed to the dependent alone and does
not involve any decisions by the military toward enlisted personnel.").

government's conduct was directed at, and intended to benefit, the fetus in order to avoid *Feres*'s application. But *Romero*'s analysis is unpersuasive, especially to the extent that it sought to differentiate in utero cases from other third-party *Feres* claims that required application of the genesis test. *Id.* at 226. ("We are persuaded that a genesis analysis is inappropriate here.").

In any event, this distinction was unnecessary because as the court ultimately concluded, the fetus's "injury did not derive from any injury suffered by a service member . . . . Because no service person was injured [the fetus's] claim is not *Feres*-barred." *Id.* at 226. Bending over backwards to discern the target and beneficiary of the treatment only served to confuse what could have been a straightforward injury-focused approach that would have led to the same result.

### *Injury-Focused Approach*

Regardless of the split in authority pertaining to the primary concern in the in utero cases, we are convinced that the injury-focused approach is the one required by Supreme Court precedent. As we have said, at a doctrinal level, we need not look much further than *Stencel Aero* to confirm that the heart of the genesis test is a service member's incident-to-service injury. Even more fundamentally, the service member's injury—and by extension, the derivative nature of a third-party injury—is the touchstone of all *Feres* claims. *See Madsen v. United States ex rel. U.S. Army, Corps of Engineers*, 841 F.2d 1011, 1012 (10th

Cir. 1987) (stressing that *Feres*'s incident-to-service test is fundamentally concerned with the relationship between the injury and the service member's status, not the negligence itself).

Along the same lines, it is worth reiterating that *Feres* is a jurisdictional doctrine that directs our focus to the injury as a threshold matter, largely independent of the viability of plaintiff's negligence or other tort claims. Remember that if *Feres* applies, then the government is immune to lawsuits notwithstanding the FTCA's broad waiver. And although we proceed on summary judgment,[11] this preliminary analysis of jurisdiction limits our full-fledged consideration of whether the government owed a duty to any party or whether that duty was breached. But the treatment-focused approach takes us away from the typical *Feres* question and requests that we purely investigate the merits of the plaintiff's negligence claim, asking us to analyze the existence of a duty, whether that duty was breached, whether the government caused the alleged injury and so forth. In the end, "[t]he mere fact that *the cause of action* is not derivative . . . but is an original and distinct cause of action . . . does not remove it from the

---

[11] We note that on summary judgment, we consider the merits of the case to the extent that they are intertwined with the question of subject matter jurisdiction. *See Pringle*, 208 F.3d at 1222. And while this procedural posture changes both the standard and the evidence available for our consideration, it is not an invitation to forego the jurisdictional question to reach the merits. In other words, we consider certain "aspect[s] of the substantive claim," *id.* at 1223, that bear on our jurisdictional analysis, *see id.* at 1223 n.3 (explaining how important jurisdictional facts under *Feres* "overlap with the merits of the FTCA claim").

prohibition of *Feres*." *De Font*, 453 F.2d at 1240 (emphasis added).

In many ways, the treatment-focused approach requests that we put the cart before the horse. The *Feres* doctrine has always operated as an antecedent jurisdictional hurdle—that is, it activates an inquiry into our ability to even consider the merits of the tort alleged against the government. The injury-focused approach appreciates this prefatory concern, deferring any substantial merits discussion related to the actions of the government vis-a-vis the third party. In order to reach those questions, we must proceed past the *Feres* bar and to do so, we consider the relationship between the third-party injury and the service member's injury as a threshold matter.[12]

And the treatment-focused approach could produce anomalous results. For example, in many cases treatment is simultaneously provided for the benefit of both mother and fetus. Oftentimes, only one of the two is injured by medical negligence. In addition, a common scenario might involve treatment aimed solely to benefit the fetus, but which results in an injury to the mother. If the baby suffers an obviously derivative injury as a result of the accidental injury to the mother, then *Feres* should bar the claim regardless of the fact that the treatment

---

[12] One might question whether discussion of the service person's *injury* and the *causal link* between the service member's injury and the third-party injury impermissibly ushers in negligence principles. But our examination of those elements exists on a jurisdictional, rather than a merits-based, plane. To the extent that we discuss injury or causation, we do so not with an eye toward whether those elements might state a prima facie tort against the government, but out of fidelity to *Feres* and *Stencel Aero* to decide whether we have jurisdiction.

was originally intended to benefit only the baby.  By the same token, we can envision a scenario where treatment was provided solely for the mother's benefit, but negligence in providing such treatment injured the baby alone.  In those cases, *Feres* would not operate as a bar because the injury could not be derivative of the non-existent injury to the mother.

One final point: we do not intend our rule here to convey that the source and scope of the treatment is irrelevant or necessarily incompatible with the inquiry under *Feres*.  An examination of the treatment may, for instance, be crucial in determining whether the service person was injured at all, *see Brown*, 462 F.3d at 612–13, or whether that injury was in fact incident to military service, *see Monaco*, 661 F.2d at 133.  But any review of the treatment can only be a means to an end—the end being whether the third-party injury is derivative of the service person's incident-to-service injury.  Phrased another way, our point is simply that looking to the target of the alleged negligence—or the treatment—is not the applicable test.  It is not the case that deciphering the target of treatment will always resolve the inquiry.  But we leave open the possibility that identifying a separate negligent act may help to establish a direct and non-derivative injury to the fetus.[13]

---

[13] The injury-focused approach is not without its flaws, as the concurrence well points out.  But the injury focus fittingly accounts for the different outcomes in cases involving fetal claims.  *Compare Brown*, 462 F.3d at 611 ("Deborah Brown sustained no physical injury whatever from the effects of the negligent

(continued...)

For those reasons, we disagree with the concurrence.  A treatment- or conduct-focused approach has its own virtues, as the concurrence explains.  But it also has its own vices, and we think the injury focus is most consistent with *Stencel Aero* and the complexities of fetal injury cases.[14]  After all, the FTCA is a broad waiver of sovereign immunity and the *Feres* doctrine excepts a class of service member claimants who are injured incident to military service.  *Feres* is concerned not so much with the government's conduct per se but with whether the claimant's *injuries* arose from that service.  We share some of the concurrence's concerns about application of the genesis test, but those concerns are not enough to adopt a categorical bar for any fetal injuries arising from obstetric care.

### *Conclusion*

At bottom, the in utero cases do not require a unique standard.  The genesis test supplies the relevant rule, and its purpose is not undercut simply because the

---

[13](...continued)
prenatal treatment."); *Romero*, 954 F.2d at 226 ("In our view the relevant inquiry in a genesis analysis is whether a service member was injured."); *Utley v. United States*, 624 F. Supp. 641, 645 (S.D. Ind. 1985) ("The only party injured by the alleged malpractice is a civilian infant."), *with Scales*, 685 F.2d at 974 (holding that servicewoman mother "sought relief for injury to herself"); *Irvin*, 845 F.2d at 127 (finding that the baby's injuries were derivative of an injury to the mother).  To be sure, this clean categorization is not entirely true to type.  *See Lewis*, 173 F. Supp. 2d at 54 (describing injuries to both mother and child but finding *Feres* inapplicable); *Del Rio*, 833 F.2d at 286 (same).  But the injury-focused approach is the superior alternative.

[14]  For instance, under the concurrence's approach, government conduct aimed at the child but injuring the mother and then derivately injuring the child would be actionable.  This situation would squarely raise *Feres* doctrine concerns.

plaintiff's injuries arose in utero. As it has always been, the test is whether the civilian (fetal) injury had its genesis in a service-related injury to a service person (mother).

### *4. Application*

Turning to the facts of this case, the focal point of our examination is whether I.O.'s injury was derivative of (*i.e.*, had its genesis in) an injury to Captain Ortiz.[15] Given this standard, plaintiff's allegations cannot overcome *Feres*. When we weigh all of the competing evidence, and view it in the light most favorable to plaintiff, we find that the injuries that I.O. sustained forming the basis of the complaint are derivative of the injuries to her mother, Captain Ortiz.

First, plaintiff failed to allege in the complaint and the briefing below that Captain Ortiz was not injured by the hospital personnel's actions. *See, e.g.*, App. at 18–19 (Complaint) (repeatedly referencing Captain Ortiz's "allergic reaction," "blood pressure problems," and "hypotension"); *id.* at 10, 26 (mentioning failure to "treat [Captain] Ortiz's condition); *id.* at 143 (Response to Motion to Dismiss) ("I.O.'s injuries are not derivative of Ms. Ortiz's."); *id.* at 146 ("As these resulting

---

[15] We reject plaintiff's apparent contention that I.O.'s injuries do not "arise[] out of activity incident to service." Aplt. Br. at 39. We decline to be misdirected from our starting point for the incident-to-service test: Captain Ortiz's injury. Were this a case in which a military member was uninjured, we would not pursue the *Feres* course in the first place. Here, we are faced with a service-related injury of a service member that potentially resulted in a derivative injury to a third party. Under those circumstances, we look to whether the service member's injury was incident to service, not the third party's. There is no genuine dispute that Captain Ortiz's injury was incident to her military service.

injuries were not derivate of Ms. Ortiz's injuries . . ."); *see also* Aplt. Br. at 6, 25.

Although on appeal plaintiff argues that Captain Ortiz was uninjured, s*ee, e.g.*, Aplt. Reply at 6–8, that argument not only comes too late, it misstates the record.

Accordingly, only if I.O.'s injuries are truly separate from Captain Ortiz's injuries can plaintiff overcome *Feres*.

But no such theory is present on this record. Indeed, the allegations in the complaint and the affidavits offered as evidence tell a tragic but straightforward story that precludes recovery. I.O.'s oxygen loss was the result of Captain Ortiz's drop in blood pressure, which was caused by the negligent administration of Benadryl following Captain Ortiz's allergic reaction to the Zantac. Even plaintiff's expert, a board-certified obstetrician-gynecologist, essentially conceded this theory in an affidavit attached to plaintiff's opposition to the government's motion to dismiss:

> Because Ms. Ortiz was given Zantac, she was given diphenhydramine (Benadryl), which is routinely given during times of allergic reaction to prevent anaphylactic response. *Anaphylaxis in a pregnant woman could lead to maternal hypoxia and/or hypotension which could, in turn, harm an unborn child.* Accordingly, diphenhydramine was given in order to prevent such an allergic reaction and to benefit and prevent injury to both Ms. Ortiz and her unborn child, I.O.

App. at 129 (emphasis added).

At bottom, the source of I.O.'s ultimate brain injury was her servicewoman mother's blood-pressure problems. It does not matter that Captain Ortiz does not

-31-

allege legal injuries[16] within the complaint; the point is that she was injured incident to service, which would bar her claims and anything derivative of them. The plain fact is that Captain Ortiz's service-related injury led to an injury to her civilian daughter. Even construing those facts in plaintiff's favor, the *Feres* doctrine—in conjunction with the genesis test—bars I.O.'s claims related to her brain injury.

With respect to the alleged failure to scrutinize the fetal monitoring strips, there is no independent injury that would support this claim. Thus, even though the defendant had a duty to review the fetal monitoring, this alleged injury to I.O. is still derivative of the injuries to Captain Ortiz. On this point, the district court succinctly (and correctly) stated "[b]ut for the administration of Zantac and Benadryl to Captain Ortiz, failure to review the fetal monitoring strips in this case would not have caused I.O.'s injuries." App. at 234–35. This conclusion is not overcome by the fact that, according to plaintiff, the monitoring of the fetal heart rate provides no benefit to the mother. As we highlighted above, the target of the treatment is not our focus in *Feres* cases.

Even if we were to adopt a treatment-focused approach, however, the result would be the same because the complaint unambiguously alleged that the

---

[16] A prudent lawyer would never allege a *legal* injury to the service person in a third-party *Feres* case. Accordingly, it is incumbent on the court to review the factual record to determine whether the facts themselves describe a *factual* injury to the service person (and whether the third-party injury is derivative of that injury).

treatment that caused the injury was provided to both Captain Ortiz and I.O.[17]

Thus, even under a treatment-focused approach, we see no reasoned way to sever the injury-inducing treatment and afford I.O. relief.

Plaintiff criticizes this approach as a sort of blanket rule that would bar all "pregnancy-related claims of children of active duty mothers, even where the mother has no injury." Aplt. Reply at 3. But where the mother is truly not injured at all, *Feres* does not apply under our rule. *See, e.g.*, *Brown*, 462 F.3d at 611; *Romero*, 954 F.2d at 226. While we focus on the injury to the mother as our starting point, our analysis does not end there. As required by the genesis test, the injury to the fetus must trace back to that injury in order for *Feres* to render the court without jurisdiction. And certainly there are also cases where the mother and the fetus are injured, but their injuries are truly unconnected—that is, the fetus's injury is not derivative of a service-related injury to the mother. But that is not the case here, and plaintiff's own allegations and concessions are decisive on this score.[18]

---

[17] In addition to the board-certified obstetrician-gynecologist, plaintiff also submitted an affidavit from a registered nurse in support of his opposition to the government's motion to dismiss. Both indicated that the Benadryl was given for the benefit of both Captain Ortiz and I.O. *See* App. at 120, 129–30.

[18] Nor do we dispute that medical personnel—including those at military hospitals—owe duties of care under state law to fetuses during and in connection with prenatal and neonatal care. *Pizza Hut of Am., Inc. v. Keefe*, 900 P.2d 97, 101 (Colo. 1995) ("Colorado, like other jurisdictions, recognizes a child's right to bring a cause of action for prenatal injuries."). Our focus on the service

(continued...)

In sum, the *Feres* doctrine applies to the injuries alleged here. We wish, frankly, that were not the case. But in faithfully applying Supreme Court authority, Tenth Circuit precedent, and the persuasive decisions from other circuits, the incident-to-service and genesis standards require such an outcome. The district court properly found that it lacked subject matter jurisdiction and granted summary judgment.

### B. Discovery Order

In addition, the plaintiff contends the district court erred by not allowing additional time and discovery to respond to the government's Rule 56 motion. Under Rule 56, a party must "state with specificity how the additional material will rebut the summary judgment motion." *Libertarian Party v. Herrera*, 506 F.3d 1303, 1308–09 (10th Cir. 2007) (internal citation omitted). Plaintiff supplied two reasons. One, that additional evidence would prove that the Benadryl was provided for both Captain Ortiz and I.O.'s benefit. Two, that the presentation of evidence concerning the fetal monitoring strips would prove an independent injury not subject to *Feres*. The district court denied the motion.

We find no abuse of discretion in that decision. As an initial matter, the government provided plaintiff with a complete set of medical records related to

---

[18](...continued)
member's injury, however, does not vitiate the duty in any way. As stressed, the *Feres* inquiry says nothing of the merits of plaintiff's claim for, in this case, medical malpractice; it is a separate and antecedent jurisdictional question.

Captain Ortiz's treatment. Plaintiff does not deny as much. The secondary documents and testimony that plaintiff requested, therefore, could not add any serious value to plaintiff's ability to defeat summary judgment, and plaintiff did not convince the district court otherwise.

Moreover, plaintiff has difficulty escaping the fact that he alleged in the complaint that Captain Ortiz suffered from hypotension and related blood-pressure problems as a result of the government employees' alleged negligence. Even in the light most favorable to plaintiff, those allegations outline an injury to Captain Ortiz, which ultimately resulted in the harm to I.O. Accordingly, there is no merit to plaintiff's argument regarding the district court's abuse of discretion in refusing to reopen discovery.

Similarly, on the fetal-monitoring issue, it appears that plaintiff had all of the relevant documents and information and cannot therefore allege the district court abused its discretion in not allowing further discovery. In any event, as we explained above, we do not credit that argument as providing an alternative avenue to escape *Feres*'s application. For this reason, the relevance of any additional discovery on the fetal monitoring strips is obviated, and the district court correctly forestalled the discovery requests.

## III. Conclusion

We AFFIRM the district court's decision granting summary judgment in favor of the government.

Ortiz v. United States, No. 13-1500

**EBEL**, J., concurring.

I agree with the majority's conclusion that the Feres doctrine, which immunizes the United States from liability for service-related injuries to military servicemembers, bars civilian I.O.'s medical malpractice claim against the Government. I therefore concur in affirming the district court's order granting the Government's motion to dismiss. Nonetheless, I write separately because I disagree with the majority's conceptual approach for determining whether Feres bars a civilian's claim for in utero injuries that arise out the military's provision of medical care to a servicemember mother.

The majority identifies two approaches for determining whether Feres applies in the context of this case—i.e., an injury-focused approach and a treatment-focused approach—and ultimately adopts the injury-focused approach. See Maj. Op. at 19, 24–31. I do not find either of these approaches persuasive. Accordingly, I propose a new, third approach that tethers the *military's* Feres-*immunity* to the *military's conduct* toward its servicemembers.

Thus, instead of focusing on whether the servicemember mother was injured by the medical treatment that harmed her fetus, as the injury-focused approach does, or on whether the servicemember mother was the intended target of the medical treatment that harmed her fetus, as the treatment-focused approach does, I would simply consider whether the civilian child's in utero injuries flowed directly from the military's immunized conduct toward its pregnant servicemember. If they do, then Feres bars the claim. This approach—which can be described as a conduct-focused approach—is not

only most consistent with the policy behind <u>Feres</u> and principles of immunity more generally, but also easier to apply and less prone to adverse unintended consequences.

Applying my conduct-focused approach here, I.O.'s claim is <u>Feres</u>-barred because her in utero injuries flowed directly from the military's provision of obstetric care to her active-duty servicemember mother. In other words, because I.O.'s injuries were a direct consequence of the military's protected conduct toward its pregnant servicemember, the military is immune from liability. Because I believe this is the most straight forward application of <u>Feres</u> to this factual scenario, I disagree with the majority's adoption of an injury-focused approach.

## I. Advantages of a conduct-focused approach

A conduct-focused approach for determining whether a civilian's claim for in utero injuries is <u>Feres</u>-barred offers two major advantages over the majority's focus on the *injury* to the servicemember mother. First, by focusing the immunity inquiry on the military's *conduct* toward its pregnant servicemember, a conduct-focused approach is most consistent with the fundamental purpose of <u>Feres</u>—i.e., to protect the "peculiar and special" relationship between the military and its servicemembers. Rather than focusing on this relationship and the conduct that is driven by it, the majority's focus on whether the servicemember mother was injured undercuts the purpose of <u>Feres</u> immunity by subjecting the military to possible liability for in utero injuries that flow from the very conduct <u>Feres</u> is designed to shield from judicial scrutiny.

2

Second, by tethering the military's <u>Feres</u>-immunity to its conduct—rather than to the often unpredictable consequences of such conduct—a conduct-focused approach comports with this Court's front-loaded immunity inquiry in other contexts. The majority's approach conflicts with our standard front-loaded immunity inquiry by conditioning the military's <u>Feres</u> immunity with respect to a civilian child's claim for in utero injuries on a post-hoc determination whether the servicemember mother was injured at the same time her fetus was injured.

### a. A conduct-focused approach is most consistent with the fundamental purpose of <u>Feres</u>.

When the Supreme Court initially created the <u>Feres</u> doctrine in 1950, it offered several justifications for its decision to immunize the military from tort liability for incident-to-service injuries sustained by servicemembers.[1] <u>See</u> <u>Feres v. United States</u>, 340 U.S. 135, 140–45 (1950). Over time, as courts distilled these justifications, three overriding rationales for the <u>Feres</u> doctrine emerged: (1) the distinctly federal nature of the military's relationship to its servicemembers; (2) the availability of alternative compensation systems for injured servicemembers; and (3) the need to preserve the military disciplinary structure by preventing judicial intrusion upon, and second-guessing of, military decisions. <u>See</u> <u>Ricks v. Nickels</u>, 295 F.3d 1124, 1128–30 (10th Cir. 2002).

---

[1] Although the <u>Feres</u> doctrine was created in the context of servicemember actions against the United States under the Federal Tort Claims Act ("FTCA"), it has since been applied to non-FTCA actions. <u>See</u> <u>Chappell v. Wallace</u>, 462 U.S. 296, 304–05 (1983) (expanding the <u>Feres</u> doctrine to include constitutional claims brought under <u>Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971)); <u>Newton v. Lee</u>, 677 F.3d 1017, 1025 (10th Cir. 2012) (expanding the <u>Feres</u> doctrine to include constitutional claims brought under 42 U.S.C. § 1983).

3

Although the viability of the first two rationales has diminished in recent years, see United States v. Shearer, 473 U.S. 52, 58 n.4 (1985) (suggesting that the first and second rationale are "no longer controlling"); United States v. Stanley, 483 U.S. 669, 683 (1987) (characterizing the second rationale as "irrelevant"), the Supreme Court has consistently reaffirmed the fundamental importance of the third rationale, see Ricks, 295 F.3d at 1130 (explaining that the importance of the third rationale has increased as the importance of the first two rationales has decreased).[2] As the Supreme Court explained in Chappell v. Wallace,

> the Feres Court was acutely aware that it was resolving the question of whether soldiers could maintain tort suits against the government for injuries arising out of their military service. The Court focused on the unique relationship between the government and military personnel— noting that no such liability existed before the Federal Tort Claims Act— and held that Congress did not intend to create such liability. . . . As the Court has since recognized, "[i]n the last analysis, *Feres seems best explained by the 'peculiar and special relationship of the soldier to his superiors, [and] the effects on the maintenance of such suits on discipline . . . .'"*

462 U.S. 296, 299 (1983) (emphasis added) (quoting United States v. Muniz, 374 U.S. 150, 162 (1963)).

---

[2] Indeed, the third rationale is the cornerstone of the "incident-to-service test," which the Supreme Court has identified as the most appropriate test for determining whether a particular claim is Feres-barred. Ricks, 295 F.3d at 1130 (citing Stanley, 483 U.S. at 682–83); see also Tootle v. USDB Commandant, 390 F.3d 1280, 1282 (10th Cir. 2004) (recognizing that the incident-to-service test "has become the primary indicator of the applicability of the Feres doctrine"). A conduct-focused approach to claims for in utero injuries aligns with this test by immunizing the military from liability when in utero injuries flow from the military's incident-to-service conduct toward a servicemember.

4

Because Supreme Court precedent clearly establishes that the military-servicemember *relationship* is at the heart of the Feres doctrine, I disagree with the majority's assertion that "the service member's injury—and by extension, the derivative nature of a third-party injury—is the touchstone of all Feres claims." Maj. Op. at 25. By conditioning Feres immunity on the existence of an injury to a servicemember, the majority makes damages the central inquiry in a Feres-immunity defense. I believe, to the contrary, that Feres immunity ultimately turns on the nature of the military's allegedly wrongful conduct rather than the injurious consequences of such conduct. See infra p. 10–11. Although an injury *to the plaintiff* is certainly a necessary element in a successful damages claim, it seems odd to make an injury to another person essential to resolving the jurisdictional question of Feres immunity.

The Supreme Court's continued reliance on the "peculiar and special" military-servicemember relationship as the primary justification for Feres makes sense given the unique structure and operational realities of the military establishment. Chappell, 462 U.S. at 300. The military is, in all respects, a "specialized community." Orloff v. Willoughby, 345 U.S. 83, 94 (1953). This community simply cannot accomplish its mission "without strict discipline and regulation that would be unacceptable in a civilian setting." Chappell, 462 U.S. at 300; see also Goldman v. Weinberger, 475 U.S. 503, 507 (1986) (explaining that to succeed "the military must foster instinctive obedience, unity, commitment, and esprit de corps"). Such are the necessities of military service that the rights of servicemembers must "be conditioned to meet certain overriding demands of discipline and duty," Chappell, 462 U.S. at 300 (quoting Burns v. Wilson, 346 U.S. 137,

5

140 (1953) (plurality opinion)), and the authority of civilian courts must be carefully circumscribed to prevent inappropriate judicial intrusion into military matters, see Gilligan v. Morgan, 413 U.S. 1, 10 (1973) (explaining that the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," the responsibility for which "is appropriately vested in branches of the government which are periodically subject to electoral accountability"); see also Orloff, 345 U.S. at 94 ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.").

As the Supreme Court explained in United States v. Johnson,

a suit upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission. Moreover, military discipline involves not only obedience to orders, but more generally duty and loyalty to one's service and to one's country. Suits brought by service members against the Government for service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word.

481 U.S. 681, 691 (1987) (footnote omitted).

Although the danger of disrupting the military-servicemember relationship is strongest when a servicemember brings a damages action directly against the military, in Stencel Aero Engineering Corp. v. United States, 431 U.S. 666 (1977), the Supreme Court recognized that the same danger lurks when a third party brings an indemnity action against the military seeking to recover damages paid by the third party to a servicemember. In Stencel, a servicemember sustained permanent, service-related

6

injuries when the ejection system in his aircraft malfunctioned during a midair emergency. 431 U.S. at 667. After paying the servicemember for his injuries, the private company that manufactured the defective ejection system filed a third-party indemnity action against the United States, arguing that the United States provided faulty specifications and components for the defective system and was therefore primarily responsible for the servicemember's injuries. Id. at 668, 670. Relying on Feres, the United States argued that it was immune from liability because the company was essentially standing in the shoes of the servicemember, whose direct damages action against the United States was itself Feres-barred. Id. at 669.

The Supreme Court agreed, concluding that the company's third-party indemnity action was "unavailable for essentially the same reasons" that the direct action by the servicemember was unavailable. Id. at 673. In reaching this conclusion, the Court emphasized that the third Feres rationale weighed against permitting the company's recovery. Id. As the Court explained, where a case "concerns an injury sustained by a soldier while on duty, the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party." Id.

As the Court's analysis in Stencel suggests, certain non-servicemember actions against the military are sufficiently related to the military's immunized conduct toward its servicemembers that they pose the same danger to the military-servicemember relationship as actions brought directly by a servicemember. Although the Court has

7

never explicitly extended its <u>Stencel</u> rationale beyond the indemnity context,[3] a civilian's

claim for in utero injuries calls for such an extension because it poses the same threat to

the military-servicemember relationship as a servicemember's own claim for pregnancy-

related injuries.  Just like the company's indemnity action in <u>Stencel</u>, which would not

have existed but for the military's provision of aircraft equipment to the injured

servicemember, a civilian child's damages action for in utero injuries would not exist but

for the military's provision of obstetric care to the servicemember mother.

---

[3] Many of our sister circuits have extended the Supreme Court's analysis in <u>Stencel</u> beyond the indemnity context, creating what is now known as "the genesis test."  <u>See, e.g.</u>, <u>Irvin v. United States</u>, 845 F.2d 126, 130 (6th Cir. 1988) (noting that "[t]he genesis test appears to have evolved from <u>Stencel</u>"); <u>Romero ex rel. Romero v. United States</u>, 954 F.2d 223, 225 (4th Cir. 1992) (explaining that the genesis test "evolved from <u>Stencel</u>" as circuits "expanded the <u>Stencel</u> rationale" to bar certain derivative civilian claims).  Based on this out-of-circuit precedent, the majority adopts the genesis test, characterizing it as asking "whether the civilian injury has its origin in an incident-to-service injury to a service member."  Maj. Op. at 15 & n.5.

I agree that this Court should adopt the genesis test, which is less a "test" in the true sense of the word than an acknowledgment that <u>Feres</u> applies to certain actions against the military that are brought by civilian claimants.  But, consistent with a conduct-focused approach, I would recast the test as asking whether the civilian injury has its origin in the military's service-related conduct toward a servicemember.  I therefore disagree with our sister circuits' characterization of the genesis test (which the majority endorses) to the extent they imply that a servicemember *injury* is a prerequisite for <u>Feres</u> immunity.  <u>See</u> <u>Romero</u>, 954 F.2d at 225 (characterizing the genesis test as barring civilian claims for injuries that had their "'genesis' in a service-related injury to a service member"); <u>Mossow ex rel. Mossow v. United States</u>, 987 F.2d 1365, 1369 (8th Cir. 1993) (characterizing the genesis test as barring civilian claims "when the injury to the civilian is a result of an injury to the service member"); <u>Minns v. United States</u>, 155 F.3d 445, 449 (4th Cir. 1998) (explaining that under the genesis test, "if a non-serviceman's injury finds its 'genesis' in the injury suffered by a serviceman incident to service, then the <u>Feres</u> doctrine bars the non-serviceman's suit").

Consistent with Stencel, the conduct-focused approach I suggest for determining whether a civilian child's claim for in utero injuries is Feres-barred protects the military-servicemember relationship by focusing on the military's conduct. Since the military is immune from liability when its provision of service-related medical care causes injuries to a pregnant servicemember, see Madsen v. U.S. ex rel. U.S. Army, Corps of Eng'rs, 841 F.2d 1011, 1012–13 (10th Cir. 1987) (applying the Feres doctrine to bar medical malpractice claim brought by active duty servicemember), a conduct-focused approach ensures that the military is also immune from liability when that *exact same conduct* causes in utero injuries to the servicemember's unborn child, cf. Harten v. Coons, 502 F.2d 1363, 1364–65 (10th Cir. 1974) (implicitly concluding that a civilian wife's claim against the military for wrongful pregnancy as a result of the military's negligent vasectomy operation on her servicemember husband was Feres-barred for the same reasons that her husband's claim was barred). In other words, the military's immunity is the same regardless of which potential claimant ultimately challenges the military's conduct.

In contrast to the military's predictable and knowable immunity under a conduct-focused approach, the majority's approach, which requires injury to a servicemember mother before the military is immune from liability for in utero injuries, breeds inconsistency and uncertainty. For example, the majority would subject the military to potential liability for in utero injuries if subsequent litigation revealed that the servicemember mother was not "truly" injured at the time her fetus was injured. See Maj. Op. at 33. Yet, if subsequent litigation revealed that the servicemember mother did

9

suffer injuries of her own, however slight, then the military would be immune from liability for the in utero injuries suffered by her fetus. It does not make sense to condition Feres immunity on something so malleable and unpredictable.

Moreover, the majority's approach would permit some civilian children to challenge through a back door the very conduct that pregnant servicemembers would be barred from challenging through the front door. This threat of liability for in utero injuries will inevitably impact how the military fulfills its medical obligations to its pregnant servicemembers. Consider, for example, the perverse incentives that flow from the majority's approach when a treatment that is needed to preserve a pregnant servicemember's health poses a great risk of injury to her fetus. Despite the military's primary obligation to provide competent medical care to its servicemember, the military may, however unconsciously, alter its course of treatment to give primary attention to the fetus rather than to the mother since the possibility of fetal injuries presents the greatest risk of future liability. Because the majority's approach will influence the military's medical decision-making with respect to its servicemembers, even if only inadvertently, it intrudes upon the very relationship that Feres is designed to protect.

### b. The conduct-focused approach better aligns with general immunity principles.

The conduct-focused approach not only is most consistent with the fundamental purpose of Feres to protect the military-servicemember relationship but also better aligns with principles of immunity generally. Although Feres is tailored to the military context, at its most basic level, Feres is an immunity doctrine that shields qualifying defendants

10

from liability. Accordingly, when determining how best to apply Feres in a given case, this Court's approach to immunity determinations in other, non-military contexts can offer helpful guidance.

Absolute immunity and qualified immunity are two such contexts. Importantly, when determining whether a particular defendant is entitled to absolute immunity or qualified immunity, this Court's inquiry focuses on the nature of the defendant's allegedly wrongful *conduct*, rather than on the often unknowable consequences of this conduct. For example, in Stein v. Disciplinary Board of Supreme Court of New Mexico, this Court emphasized the prosecutorial nature of the defendant prosecutors' allegedly wrongful *conduct* in determining that they were entitled to absolute immunity. 520 F.3d 1183, 1189, 1193–94 (10th Cir. 2008). Similarly, in Thomas v. Kaven, this Court considered the unconstitutional nature of the defendant officers' allegedly wrongful *conduct* in determining that they were not entitled to qualified immunity at the Rule 12(b)(6) stage of litigation. 765 F.3d 1183, 1195–98 (10th Cir. 2014) (explaining that the defendants were not entitled to qualified immunity because the facts, as alleged in the complaint, were sufficient to demonstrate that their decision to place the plaintiff parents' child on a temporary medical hold violated the clearly established constitutional right to familial association). In neither context was immunity determined by, or predicated upon, the nature of the resulting injury or the identity of the injured person.

This Court's analytical approach to absolute immunity and qualified immunity suggests that, as a general principle, immunity determinations should turn on the nature

11

of the defendant's actual conduct, which logically precedes the injurious consequences of such conduct. Conditioning the immunity determination on a *defendant's conduct* (which a defendant can control), rather than a *plaintiff's injuries* resulting from such conduct (which a defendant cannot necessarily control or even anticipate), makes sense given that the *defendant* is the party seeking the benefit of immunity. Consistent with this Court's front-loaded approach to immunity in other contexts, the conduct-focused approach I suggest predicates the military's <u>Feres</u> immunity upon its service-related conduct toward servicemembers.

The majority's injury-focused approach, in contrast, conflicts with this Court's general immunity inquiry by conditioning <u>Feres</u> immunity not on the nature of the military's conduct, but on a court's later determination whether that conduct did, or did not, coincidentally result in injuries to a servicemember.[4] Because the military (like any

---

[4] Because I.O.'s complaint did not allege that her servicemember mother suffered a compensable injury as a result of the Government's allegedly negligent administration of Benadryl, the majority labors to explain why the Government is entitled to <u>Feres</u> immunity despite the absence of an allegation that a servicemember was injured. <u>See</u> Maj. Op. at 32. Attempting to draw a distinction between legal injuries and factual injuries, the majority explains that "it is incumbent on the court to review the factual record to determine whether the facts themselves describe a *factual* injury to the service person" because a "prudent lawyer would never allege a *legal* injury to the service person" when asserting a claim for in utero injuries. Maj. Op. at 32 n.16.

Rather than strengthen the majority's position, this explanation—which is not supported by a single citation—reveals how precarious it is to base the military's liability for in utero injuries on the presence or absence of an injury to someone *other than the child claimant*. After all, the child claimant is seeking damages for *its* injuries, not the servicemember mother's injuries. The mother is only relevant to the <u>Feres</u> inquiry to the extent that her status as a servicemember implicates the military's chain of command. (Indeed, there is no <u>Feres</u> inquiry if the mother is not a servicemember.) Because it is the

12

other defendant) cannot directly control all of the consequences of its conduct, it is unclear why the military's Feres-immunity should hinge on something as uncertain as a judge's post-hoc determination whether the servicemember mother suffered an injury. This back-loaded approach not only runs contrary to general immunity principles but also perversely *rewards* the military—in the form of Feres immunity—when its conduct harms not just the fetus, but the servicemember mother as well. For example, if the military harms *both* the mother and the fetus, then it is entitled to Feres immunity; but if it harms *only* the fetus or deliberately chooses to protect its servicemember at the expense of harming the fetus, then it is not entitled to Feres immunity.

And perhaps most problematic, these unpredictable outcomes and perverse rewards force the military into a wholly untenable litigation position whenever it faces possible liability for a civilian child's in utero injuries. Because the military's Feres immunity in this context is based on the fortuity of an injury to the servicemember mother, to have any chance of successfully invoking such immunity in a suit brought by a civilian child, the military must argue that it injured its pregnant servicemember. But, because it is possible that a court will ultimately determine that the servicemember mother was not injured, thereby foreclosing the availability of Feres immunity, to have

---

servicemember mother's relationship to the military that matters, not her injuries or lack thereof, the majority's injury-focused approach injects an unnecessary and superfluous consideration into the Feres inquiry. Moreover, because the military cannot be sure that the mother suffered a *factual* injury until after litigation has commenced, I do not see how the military would ever know how to evaluate its potential liability at the time it is committing to the actions which later may, or may not, subject it to liability.

13

any chance of successfully defending against the child's claim, the military must simultaneously argue that its conduct, although injurious to the mother, was *not* injurious to her unborn child. There is simply no good reason to require the military to engage in this kind of legal gymnastics in order to avail itself of <u>Feres</u> immunity.

## II. Application of the conduct-focused approach

Applying a conduct-focused approach to determine whether I.O.'s claim is <u>Feres</u>-barred, I would simply consider whether her alleged in utero injuries flowed directly from the military's incident-to-service conduct toward her mother, an active duty servicemember. The military's provision of obstetric care to I.O.'s servicemember mother is clearly incident-to-service conduct for which the military is immune from liability under <u>Feres</u>. <u>See</u> <u>Madsen</u>, 841 F.2d at 1012–13. Thus, I.O.'s claim is <u>Feres</u>-barred if her alleged in utero injuries can be said to flow directly from this protected conduct. Because I.O.'s in utero injuries necessarily derived from the military's immunized conduct toward a servicemember, her claim is <u>Feres</u>-barred.

This conclusion stems from the very nature of the mother-fetus relationship, which is unlike any other. Until the moment of birth, mother and fetus are inexplicably intertwined—they share oxygen, nutrients, and a physical body. By virtue of their inseparability, mother and fetus share a unity of interests. Although medical interventions may, at times, be directed more particularly to either the mother or her fetus, at all times the mother's interest in safely delivering her child aligns with the fetus's interest in a healthy birth. Because these ultimate interests are indivisible while

14

the fetus is in utero, it seems likely to me that a mother will inevitably be injured whenever her unborn child sustains in utero injuries.

Thus, I disagree with the majority's conclusion that fetal injuries can occur even though "the mother is truly not injured at all." See Maj. Op. at 33. This conclusion not only defies the physical realities of pregnancy, but it also fails to acknowledge the unique mother-fetus bond and the inevitable mental or psychological injury a mother experiences whenever her unborn child is injured.

Given the *sui generis* nature of the mother-fetus relationship, the military's obligation to provide competent medical care to a pregnant servicemember extends to her unborn child. For the military to care properly for a servicemember during her pregnancy, that care will undeniably include not only attending to the servicemember's health but also attending to a successful delivery of the fetus from her body. The reality is that the military acts toward *both* mother and fetus whenever it provides obstetric medical care to *either* mother or fetus. See Scales v. United States, 685 F.2d 970, 974 (5th Cir. 1982) (explaining that the treatment accorded to a pregnant servicemember mother is "inherently inseparable" from the treatment accorded to her fetus). Thus, regardless of whether the military's obstetric medical care injures the mother or her fetus,

15

or both, <u>Feres</u> immunity attaches because such injuries are a direct result of the mother's military status.[5]

### III. Conclusion

I.O.'s claim is <u>Feres</u>-barred because her in utero injuries necessarily flowed from the military's incident-to-service conduct toward her servicemember mother.  Although harsh in its result,[6] this conduct-focused approach has two noteworthy advantages.  First, by tethering the military's <u>Feres</u>-immunity to its service-related conduct toward pregnant servicemembers, the conduct-focused approach is consistent with the fundamental purpose of <u>Feres</u> to protect the "peculiar and special" relationship between the military and its servicemembers.  Second, by zeroing in on the nature of the military's conduct, rather than the consequences of such conduct, the conduct-focused approach aligns with general principles of immunity.  As long as <u>Feres</u> remains the law, we are tasked with

---

[5] Importantly, however, as the unity of interests between mother and fetus—which is anchored in their physical inseparability while the fetus is inside the mother's body—begins weakening during the birth process, so too does the rationale for applying <u>Feres</u> to in utero claims.  Indeed, once a baby is born, and therefore becomes physically separate from the servicemember mother, this rationale dissipates.  At that point, it makes sense to consider the military's actions toward the baby separately from the military's actions toward the servicemember mother.

[6] The <u>Feres</u> doctrine itself has often been criticized as harsh, but the Supreme Court has not backed down in the face of such criticisms.  <u>See, e.g.</u>, <u>Ritchie v. United States</u>, 733 F.3d 871, 874 (9th Cir. 2013) cert. denied, 134 S. Ct. 2135 (2014) ("For the past sixty-three years, the <u>Feres</u> doctrine has been criticized by 'countless courts and commentators' across the jurisprudential spectrum. . . . However, neither Congress nor the Supreme Court has seen fit to reverse course.").

upholding it.  Because I think that a conduct-focused approach is most consistent with

this obligation, I respectfully concur.[7]

---

[7] I concur with both the majority's conclusion that I.O.'s claim is <u>Feres</u>-barred and its conclusion that the district court did not abuse its discretion in denying I.O. additional time and discovery to respond to the Government's Rule 56 motion.  <u>See</u> Maj. Op. at 34–35.